## NOE *et al.* v. CARD *et al.*

A GRANT of a lot in San Francisco by a Justice of the Peace, under the Mexican Government to the husband, subject to the conditions, that within one year, the lot shall be fenced and a house constructed thereon, and that certain municipal fees, established by law, be paid, is a donation, and not a purchase, and the lot constitutes the separate property of the grantee.

A donation, by both the civil and the common law, may be accompanied with conditions, the performance of which may be required for the possession or enjoy-

Noé *v.* Card.

ment of the property donated; but the conditions do not necessarily make the transaction a sale.

Conditions which require the performance of services are not onerous in the sense of the Spanish law, so as to convert the transaction into one of contract, when they are rendered by the grantee for his own benefit; they are only so when rendered for the benefit of the grantor, or parties other than the grantee.

The conditions of fencing, building, paying the municipal fees, etc. attached to grants of town lots by the municipal authorities, take from the grants their character as pure donations ; but the grants are none the less donations.

Under the Mexican, Spanish, and common law, donations are of three classes— pure, remuneratory, and conditional. They are pure, when made without condition, as charities; remuneratory, when required by no legal obligation, but are made from a regard for services rendered, as pensions; conditional, when accompanied with provisions intended to secure the purposes for which they were made, as grants of land for institutions of benevolence, for hospitals, schools, asylums, and the like.

The Texas decisions on this point commented on and disapproved.

The Louisiana decisions cited and approved.

The Louisiana grants were generally on conditions, as onerous as those annexed to the California grants. (See copy of a Louisiana grant in note.)

Under the Spanish law, labor or expenditures incurred by the community for the preservation or improvement of separate property did not change its character ; but simply created a charge against it in favor of the community.

So here, whatever was expended by the community, existing between Noé and his wife, in performing the conditions attached to the grant, constituted a claim in its favor against the separate estate of Noé, but did not affect the title to the property; that was fixed by the terms of the grant, which was to the husband alone.

In ejectment, upon a disclaimer of possession or interest in the property, a judgment for plaintiff cannot be entered.   When such disclaimer is relied upon, the only proper judgment is one of nonsuit.

Such disclaimer is a proper basis for a judgment for plaintiff only in actions by a party in possession to determine estates or interests asserted adversely to him.

APPEAL from the Twelfth District.

This is an action of ejectment brought in the Twelfth District Court, for a fifty-vara lot in San Francisco.   The judgment below was for the defendants, and the plaintiffs have appealed.

The case was tried without a jury, and the Court found the following facts, viz:

"1. On the 14th December, 1843, the plaintiff, José de Jesus Noé, received from Francisco Sanchez, J. P. of the pueblo and jurisdiction of San Francisco, a grant of a lot described in his petition, a translation of which petition and grant are as follows, viz:

'Justice of the Peace:

Jesus Noé, citizen and resident of this jurisdiction, appears before you and states : That, having to establish myself in the place called Yerba Buena, to effect which object I require a fifty-vara lot to build a house, for which I apply to you, that, in the exercise of your authority, you concede to me that which adjoins the lot of Mr. Smith, (on the south,) which is unoccupied. Therefore, I solicit your attention to my petition according to justice, admitting the same on common paper, in consideration of there being no stamped paper of the proper kind in this place.   I take the customary oath, etc.

San Francisco de Asis, Dec. 1, 1843.

J. de Jesus Noe.

San Francisco, December 14, 1843.

The foregoing petition having been presented and admitted, in consideration of the solicitation therein expressed, I the Justice of the Peace of this jurisdiction, citizen Francisco Sanchez, in virtue of the authority conferred on me in such matters, concede to the petitioner the lot which he has solicited; and in order that he should hold it legally, and make such use thereof as he may deem proper, I hereby adjudge the same to him in property; and this document shall serve him as a title thereto, and I place him in lawful possession thereof, for his security, subject to the following conditions :

1st. That within the term of one year from this date the said lot shall be fenced in and a house constructed thereon.

2d. That the petitioner shall hold the lot subject to the municipal laws and regulations now existing, and those which may be hereafter established.

3d. That in case of the non-fulfillment of the first condition, above expressed, the petitioner shall lose his right to the said lot; and his non-conformity to the second condition, above expressed, will expose him to the penalty of infraction.

4th, and last. That the municipal fees established by law, and corresponding to the said lot, shall be duly paid.   And having delivered to the party interested this document, for such use as may be convenient, note thereof has been taken in this office,

in the respective book of records, this day.    Signed by the Judge and his assistants.

FRANCISCO SANCHEZ.

Pedro Sherreback, Assistant. )
Francisco De Haro,    "    }

Municipal fees, $12½.    Received, Pedro Sherreback.    Received $3¼ for the possession of said lot.'

And the same was duly recorded in the Recorder's office of the county of San Francisco, on the 11th day of January, 1855.

2. Said José de Jesus Noé paid to the municipal authorities the municipal fees referred to in condition four of the grant, a memorandum of which is entered at the foot of said grant; and entered into the possession of said lot, and complied with the conditions of said grant.

3. At the time of said petition and grant, said José de Jesus Noé was intermarried to and with Guadalupe Garduña Noé; and that said Guadalupe died, in the month of June, A. D. 1848, leaving, as the issue of said marriage, six children, herself surviving, viz: the said plaintiffs, Miguel Noé, Maria Dolores Noé, Espedion Noé, José Jesus Noé, Vicente Noé, and M. Concepcion Noé, all of whom were born after the year 1834, and the latter of whom died in 1853, unmarried and intestate.

4. On the 18th day of June, A. D. 1849, the said José de Jesus Noé, (the elder,) signed, sealed, acknowledged, and delivered, his deed to Charles A. Gurley, (in consideration of twenty thousand dollars, which were then paid to said Noé by said Gurley,) giving, granting, selling, and conveying, unto said Gurley, his heirs and assigns, the lot described in the complaint, save one-fourth part thereof, being twenty-five varas square, lying in the northwest corner of said lot, measuring each way from said corner twenty-five varas; which deed contained covenants by said Noé to said Gurley, his heirs and assigns, that he (said Noé) was seized in fee of said land; that the same was free of all incumbrances; that he had good right to sell and convey the same to said Gurley, his heirs and assigns forever, against the lawful claims and demands of all persons; and the said deed was duly recorded in a book of records kept by the Alcalde for that purpose.

5. At the time of the execution of the said deed to the said

Gurley, said Noé was in possession of said lot, and that the said three-fourths conveyed to said Gurley, was delivered to said Gurley, who has ever since, with his assignees, and grantees, and tenants, had the exclusive possession, except as to a piece or portion of said lot, being the northeast corner thereof, fronting easterly on Brenham Place, sixty feet front, and being that width to the depth of sixty-eight feet and nine inches; occupied, at the commencement of this suit, by the Monumental Engine Company, which is a part of the Fire Department of this city and county.

6. The present defendants, (except Francisco de Leon, and the city and county of San Francisco,) are possessors, some as grantees of said Gurley in fee simple, and others as tenants of such grantees, and claiming, holding as such, by divers mesne conveyances (for valuable considerations by them respectively paid) of said three-fourths of said lot conveyed to said Gurley, and that Gurley and said defendants under him, have laid out and expended upon said property large sums of money in improvements upon the same, from June, 1849, down to the commencement of this suit, and have received large rents and profits on the same, and that the value of said buildings and improvements amounts to the present value of fifteen thousand dollars.

7. That said one-fourth of said premises excepted out of said conveyance to said Gurley, was conveyed in fee simple by said Noé (the elder,) by a deed signed, sealed, and delivered, to said Francisco de Leon, on the 24th day of November, A. D. 1856, in consideration of the sum of seven thousand dollars, paid by said Leon to said Noé; (the elder;) and that said Leon has ever since possessed the same; and that said deed was duly acknowledged and duly recorded in the Recorder's office of the county of San Francisco, on the 24th day of November, A. D. 1856.

8. At the death of said Guadalupe, and the execution of the deed to said Gurley, said Noé (the elder,) was also in the possession of a rancho adjoining the pueblo of San Francisco, called "San Miguel," containing four thousand four hundred and forty-three acres, and worth, at those times, twenty thousand dollars, under a grant which was an ordinary grant of the Governor of California, Pio Pico, to said José de Jesus Noé, December 23d,

A. D. 1845, which was during the marriage of the said José de Jesus Noé and said Guadalupe.

9. On the 5th day of March, A. D. 1858, the said José de Jesus Noé (the elder,) as the heir, representative, and successor in interest, of M. Concepcion Noé, Miguel Noé, and Maria Dolores Noé, granted, bargained, sold, and conveyed, to the plaintiffs, Richard Roman, Isaac N. Thorne, and Tully R. Wise, their heirs and assigns, one undivided half of all their right, title, and interest, in and to certain real estate, and of their claim to rents, issues, and profits, out of the same; and, among others, the said 'San Miguel Rancho,' and the said fifty-vara lot described in the complaint, in consideration of the sum of one dollar and certain covenants in the said deed of Roman, Thorne, and Wise, 'to sue for and take all legal steps to recover the interests to which they are entitled in the property above described, and to pay all costs, charges, and disbursements, necessary and proper to prosecute and recover said rights,' and to hold their said grantors 'free and harmless from all costs, charges, and disbursements, on account of said suits, and in no event,' to permit their said grantors to ' be made liable or responsible for any costs or charges arising from said suits, and that their remaining interest in the property above described shall be kept clear from all incumbrances arising from the prosecution of said interests; and to prosecute the rights of the parties' to said deed, 'with all just and convenient dispatch' to final judgment within three years, or to reconvey; and that neither party shall ' sell, transfer, compromise, or dispose of, any interest in any of the property' in said deed described, without the consent of the other parties, until the final termination of the said suit.

10. That on the trial there was no evidence, nor was anything said about the said children of said José de Jesus Noé, and said Guadalupe Garduña Noé (by any act, or in any manner, by themselves or their father or guardian) after the death of their mother, and prior to the beginning of this suit, accepting the succession or estate of their said mother, but the said point was raised and argued in the briefs of the respective counsel, submitted after trial."

And, as a conclusion of law, the Court found that the plaintiffs were not entitled to the premises described in the complaint, nor

any part thereof; and that the defendants were entitled to their judgment against said plaintiffs for their costs and disbursements in this behalf expended.

The plaintiffs did not move for a new trial, but took an appeal, bringing before the Supreme Court the judgment-roll, and the findings of the Court below.

The defense set up in the answers, consists of: 1. The general denial. 2. Plea of title in the defendants and those under whom they hold. 3. Plea of *bona fide* purchasers for valuable consideration without notice. 4. An estoppel arising from acts *in pais,* in standing by and seeing defendants spending large sums of money, on the lands, without claiming the same, etc.

*Tully R. Wise,* for Appellant.

*B. W. Leigh,* of Counsel.

I.   The lot granted to Noé was community property.

All property acquired during marriage, by husband and wife, or either of them, and the profits of the separate property of each, was, by the civil law, community property, except such property as was acquired by either of them by gift, bequest, devise, or descent.   (See Schmidt's Civ. Law of Spain and Mexico, Arts. 45—48, and the authorities there cited.)

The premises in controversy in this case were acquired under the grant to Noé, during the continuance of the marriage.   If, therefore, the grant was not a gift to the husband alone, the lot was community property.

Was the grant a gift?   A gift is the same under all systems of law.   It differs from a contract in being always gratuitous.   (See 2 Blacks. Com. 440; White's New Recop. Tit. Ganancial Property; Bouvier's Law Dic. verb. Gift.)

The least consideration destroys a gift.

Blackstone says, that even a pepper-corn will, in the eye of the law, convert a gift, if executed, into a grant; if not executed, into a contract.

A consideration is "any benefit to the person making the promise, or any loss, trouble, or inconvenience to, or charge upon, the person to whom it was made."   (See Smith on Cont. 88.)

The common law follows the civil law in respect to the definition of a consideration, and the species into which considerations are divided.    (See 2 Blac. Com. 444.)

Those species are four: 1. *Do ut des.*    2. *Facio ut facias.* 3. *Facio ut des;* and, 4. *Do ut facias.*

There was a consideration for the grant to Noé.

The consideration was double: The lot was granted to him upon the payment by him of twenty-five cents for each vara it contained, and upon the condition that he should build a house, and make other improvements upon it, within a specified time. These were, at once, benefits to the government, and a trouble and inconvenience to, and a charge upon, Noé.

The twenty-five cents per vara, paid by Noé, was a pecuniary consideration for the grant; and made the transaction a sale, and not a gift.

The money was not the sole consideration for the grant; but the fact that it constituted a part of the consideration is sufficient to prove that the grant was not a donation.

But even if the payment of twenty-five cents per vara had not been required, the grant would not the less have been a contract, and not a gift.

The grants of land in California, under the Mexican Colonization system, were not donations but contracts.    (*Boisdore's Case,* 11 How. 63; *Clamorgan's Case,* 13 Id. 250; *Villemont's Case,* Id. 261; *Aredondo's Case,* 6 Pet. 745; *Welch* v. *Sullivan,* 8 Cal. 165.)

Annexed to grants, like those in California, were conditions which made them contracts, while a grant without conditions, as in *Cambuston's Case,* (20 How. 64,) was a pure donation.

In Texas, where the same system which was in force here prevailed, it is held that the performance, by a husband and wife jointly, of the conditions annexed to grants, makes the land community property.    (*Yates* v. *Houston,* 3 Texas, 433; *Burri* v. *Wideman,* 6 Id. 233; *Edwards* v. *James,* 7 Id. 372; *Parker* v. *Parker,* 10 Id. 83; *Robinson* v. *McDonald,* 11 Id. 385; *Parker* v. *Chance,* 11 Id. 513; *Jones* v. *Jones,* 15 Id. 143; *Stramler* v. *Coe,* Id. 211; *Monroe* v. *Leigh,* Id. 519; *Chapman* v. *Allen,* Id. 278; *Smith* v. *Strahan,* 16 Id. 314; *Duncan* v. *Rawls,* Id. 476; *Scott* v. *Maynard et al.* Dall. 548.)

The Louisiana cases are not applicable because the system was

different—no conditions being attached to the grants. ( *Wilkinson* v. *American Iron Mountain Co.* 20 Mo. 5 Ben. 122—128.)

Again : The municipal fees paid by Noé must be presumed to have been community property. And if so, the consideration for the grant was given by the community, or at its expense, because the other branch of the consideration, to wit: performance of the conditions, was by Noé and his wife jointly, and hence came from the community. (See Nov. Recop. Ley 4, Tit. 4, Lib. 10; Schmidt's Civ. Law of Spain, etc. Art. 63; Escriche, verb. Bienes Gananciales; *Montaguet* v. *Fromart*, 7 Mart. La. 362; *Babbin* v. *Nolan*, 6 Rob. La. 508 ; Succession of Baum, 11 Id. 514; *Lott* v. *Keach*, 5 Tex. 394; *Love* v. *Robertson*, 7 Id. 6 ; *Huston* v. *Curl*, 8 Id. 239; *Hemmingway* v. *Matthews*, 10 Id. 207; *Parker* v. *Chance*, 11 Id. 513; *Wells et ux.* v. *Cockrum*, 13 Id. 127; *Berry* v. *Wright*, 14 Id. 271; *Chapman* v. *Allen*, 15 Id. 278; *Claiborne* v. *Tanner*, 18 Id. 69.)

*Hoge & Wilson,* for Respondent Card, and others.

I.   The property in question was not the common property of Noé and his wife.

*Gananciales*, or common property, was unknown to the Roman law. It was first adopted in Spain by custom, probably taken up from Germany, or some adjacent country, and enacted by Spanish and Mexican statutes and codes. (See 1 White's Recop. 60, Note 43; *Cole's Widow* v. *His Executors*, 9 Mart. 420; 7 N. S. 78.)

" *Ganancial* property is all that which is increased or multiplied during marriage. By multiplied, is understood all that is increased by onerous cause or title, and not that which is acquired by a lucrative one, as inheritance, donation, etc." (1 White's Recop. 61.)

" Property acquired by either after marriage, by a gratuitous title, such as inheritance, donation, or bequest, does not belong to the community." (Schmidt's Law of Spain, etc. 13 ; *Panaud* v. *Jones*, 1 Cal. 514.)

"A sale is a contract, by which one engages to transfer the full property of the thing to another, who engages to pay the price therefor." (Schmidt's Law of Spain, etc. 131, 132; 2 Moreau & Carlton's Partidas, 661.)

Noé v. Card.

The first question, then, resolves itself into the inquiry as to whether the grant to Noé was a donation or a sale.

Conditions annexed to a grant do not necessarily make it a sale. (Broom's Legal Max. 299, *et seq.; Executors of McKane* v. *Bonner,* 1 Bailey, S. C. 116, 117; Schmidt's Law of Spain, etc. 202, Sec. 966; Id. 210, Arts. 988—994; 2 Mor. & Carl. Partidas, 646.) And if the conditions are not performed, the donation, that is, the grant, may be revoked. Donations, or gifts, under the civil law, differ from gifts under the common law. For instance, a gift by the common law, delivered and executed, cannot be revoked; while under the civil law a donation, without conditions even, may be revoked for mere ingratitude in the donee. But by both systems a gift may be conditional.

The Louisiana grants have been treated as gifts to the donee —his separate property. (See *Frique* v. *Hopkins,* 8 Mart. 110; *Gayoso de Lemos* v. *Garcia,* 6 Id. 530; *Roque's Heirs* v. *His Executors,* 8 Mart. 425; *Hughey* v. *Barrow,* 4 La. An. 248.) If the conditions annexed to the King's grant did not make it a sale, neither could they make the same style of grant of any other officer a sale, for the "King" is but another name for the government. And nearly all the Louisiana grants were upon conditions. (*Fremont's Case,* 17 How.; *Chew* v. *Calvert et al.* 1 Walker's Miss. 59, 60.)

That the California grants were donations, and not sales, further appears from the fact, that sometimes the conditions were very informal, sometimes omitted. (*United States* v. *Larkin,* 18 How. 563.)

The Texas cases are not equal as authority to the Louisiana cases, and to the decisions of the Supreme Court of the United States. The fact, that the conditions of a grant are performed by the common labor of husband and wife, does not give the latter any right to the property, but, at most, entitles the community to reimbursement. (8 Martin, 114; Febrero, 2, Lib. 1, Cap. 4, Sec. 4, Nos. 74, 75; Schmidt's Law of Spain, etc. 13, Art. 48.)

If, then, grants under the colonization laws of Mexico were donations, and not sales, it follows, that grants by pueblos were also donations. Such grants were made under the colonization laws, and in furtherance of a general policy of the government. The pueblos bore the same relation to the citizen of the pueblo,

38

in their grants of town lots, that the government bore to the grantee of a rancho. Indeed, towns and cities were objects of peculiar favor. (Ex. Docs. 1st Ses. 31st Cong. 5th Vol. 1849—1850, p. 133; Wheel. Land Tit. 5, Sec. 13; 2 White's Recop. 43; Regulations of 1828, Secs. 10, 13, 15.) Usually, these town lots were gratuities. (2 White's Recop. 45—51.)

The regulations for the disposition of town lots make a distinction between donations and sales. Whenever a sale was intended, the price and value were always ascertained in a fixed business way. (1 White's Recop. 621; Id. 608, 593, 489, 439, 606, 607, 436—438; Wheel. Land Tit. 10, 13, 15; Acts of the Territorial Deputation; 1 Cal. 122.)

The language of the petition and grant here, is only reconcilable with a donation, and not a sale. The petition is not to buy; but that it be conceded to the petitioner. It is conceded, on condition, that he simply conform to the rules of public policy. The payment of a municipal fee is asked as a fee, a duty, a tax, not as a price. To constitute a sale, there ought to have been specified in the grant, " the names of the parties, the thing sold, the date of the transfer, and the price paid." (*Hayes* v. *Bona,* 7 Cal. 158, 159; *Stafford* v. *Lick,* 10 Id. 17; *Chew* v. *Calvert,* 1 Walk. Miss. 60.)

Again: All lots in California were valued at one price, on the theory that these Alcalde grants were sales. If, on the other hand, the fee paid was a mere tax, then the uniformity of the tax is accounted for. A price which bears no proportion to the actual value of the thing sold, is not a real price, - - and the contract is a donation, not a sale. (Pothier on Sales.)

Now, as donations, it is easy to carry out and explain all the powers of the pueblo over the grantees. If the conditions were not fulfilled, the grants could be revoked, and were revoked, without restoring the money. But if these were sales, there could be no rescission by the vendor, without restoring the purchase money. As a donation, the thing is clear. For a failure to perform, the gift lapses back to the donor; the money not being purchase money, but fees to the officers, or a tax to the local government, or anything else than a price, cannot, on any principle of equity or justice, be required to be restored.

So, on all sales under the Spanish and Mexican law, there

Noé v. Card.

were implied warranties of title, etc. Certainly there could be no claim of such a character on a Governor's or Alcalde's grant.

Such grants of town lots and ranches were made to married women, on their own petitions, and were treated as gifts. (See Wheel. L. T. 25, 26, 41, 46, 47; *Reynolds* v. *West*, 1 Cal. 323; *Ingoldsby* v. *Juan*, 12 Id.)

If these pueblo grants were sales, and not gifts, why were the grantees limited to one lot each? . Why were not the lots sold at auction, or appraised? Why were all lots, good and bad, fixed at one municipal fee?

Again: The finding of the Court is, that Noé paid the municipal fee. The legitimate inference and the proper construction of the finding is, that Noé, out of his separate estate, paid the fees, and that, out of the same source, he caused the conditions to be performed. (*Nelson* v. *Lemmon*, 10 Cal. 49; *Grewell* v. *Henderson*, 7 Id. 290; *Ford* v. *Halton*, 5 Id. 321; *White et al.* v. *Abernethy et al.* 3 Id. 426; *Thompson* v. *Manson*, 2 Id. 99; *Blaney* v. *Findley*, 2 Blackf. 338; *Evans* v. *McMahan*, 1 Ala. 45; *Ellis* v. *Dunn*, 3 Id. 632; *Ice* v. *Manning*, Id. 121; *Dearing* v. *Smith*, 4 Id. 432; *Gary* v. *Wood*, Id. 296.)

It being then found by the Court that Noé paid the "municipal fee" out of his own estate, the result is, that if this was a purchase, it still remained the separate estate of Noé. By changing the form of his separate estate he did not lose it, but, during all its mutations, it was his own separate estate. (*Meyer* v. *Kinzer*, 12 Cal.; *Smith* v. *Smith*, Id.)

Counsel say: "All property of a husband and wife, or of both or either of them, is, by the civil law, presumed to be commu nity property, until the contrary is shown."

This may be true; but it is a rule of evidence of the civil law. That rule of evidence does not prevail here. Whether the land in controversy was the separate property of Noé, or *ganancial* property, must depend on the Mexican law at the time; "but in adjudicating on that right, and in enforcing the remedy, we can acknowledge no other law of evidence or rule of proceeding than those of our own forum." These are the common law rules of evidence. (*Lewis* v. *San Antonio*, 7 Texas, 308, 309, citing Story's Confl. of Laws, Ch. 14, Sec. 558; *Bank U. S.* v. *Donally*, 8 Peters, 361—373; Note to Sec. 557, Story's Confl.

of Laws; *Drew* v. *Lipman*, 5 Clark & Finnel, 1—14; *Tevis* v. *Pitcher*, 10 Cal. 473.)

By the common law, we know of no such rule of evidence or presumption. There could, of course, be none, because there is no common property. If there is any presumption at all, arising from the fact of acquisition, it must be that the party in whose name the title is taken is the sole owner.

The *onus* was then on the plaintiffs, to establish, by evidence, the fact that this was ganancial property, and that the municipal fees paid came from the common property. They failed to prove any such facts, and the finding of the Court is, that Noé paid the fees. But even if the money was paid out of the community funds it would not make the land community property, but simply give the community a just claim against Noé for the money. (5 An. La. 216.)

*Johnson & Rose*, for Respondent F. de Leon.

The first question is : Was the lot granted to Noé his separate property, or common to him and his wife ? The community of property between husband and wife was unknown to the Roman law. It first appears in the written law of Spain in the Fuero Real. The Partidas do not mention it. Some of the provisions of the Fuero Real on this subject, together with some subsequent laws, were incorporated into the Nueva Recopilacion, in the 5th Book and 9th Title, and afterward into the Novisima Recopilacion, in the 10th Book, 4th Title. They may be found in the compilation called Pandectas Hispano-Mejicanas, (Vol. 2, p. 447.)

The first three laws of the books and titles mentioned above may be translated as follows :

1. Everything that husband and wife, living together, acquire or purchase, let both have it in equal shares; and if it be a donation from the King, or anybody else, and he give it to both, let husband and wife have it; and if he give it to one of them, let that one only have it to whom he shall give it.

2. If the husband acquire anything by inheritance from father or mother, or other relative, or by donation from prince or relative, or friend, or in the King's service in the field, or that of another, going out on his pay, let him have all he shall acquire for

Noé v. Card.

his own; and if he serve in the field without pay, at the expense of himself and wife, whatever he shall acquire in this way, let it all belong to husband and wife; for, as the expense is common to both, let what they shall so acquire be common to both.   What is said above of the acquisitions of husbands, let the same be (said) of wives.

3. Although the husband have more than the wife, or the wife more than the husband, whether in realty or personalty, let the fruits be common to both; and let the realty, and the other things from which the fruits come, belong to the husband, or to the wife, whose they were before, or their heirs.

It will be observed that property, coming to one of the consorts by donation, is declared to be the separate property of the donee.

The annexation of conditions to the grant, simply makes it a conditional donation.   (Part. 5, Tit. 4, Law 4; Cush. Domat, Vol. 1, No. 927.)   According to the method of most civilians, all donations, *inter vivos*, are contracts.   (Cush. Domat, Vol. 1, No. 918; Febrero Novis. Lib. 2, Tit. 4, Cap. 22, Sec. 1; Feb. Mejic. Vol. 3, p. 217; in the same words, 3 Toullier, Lib. 3, Tit. 2, Cap. 1; Donations et Testamens, No. 4, see Note 1; Gomez Variac Resolutiones, 554; de Donatione, Cap. 4, No. 1.)

Now, do the conditions in the grant to Noé change its character, and take it from the purview of the laws above cited? The only conditions relied on are the first and last.

The first condition is the very object for which Noé solicited the grant, to wit: "to build a house" upon; and for himself, not for the government.   His petition estops him, and those claiming under him, from denying that he wanted the lot for this purpose.   His wife and her heirs, are bound by this declaration, made by the head of the community.   (*Caldwell* v. *Hennen*, 5 Rob. La. 20, 21, 25.)   Hence, compliance with this condition was not a consideration moving out of the donee to the donor.

But it is said the *Derechos Municipales* did constitute a consideration, moving directly from the grantee to the grantor; that it was a price, and the transaction a sale.   In every respect this is erroneous in point of fact.   The real grantor was the Supreme Government of Mexico, and the Justice of the Peace but the agent of the government in making the grant, not of the Ayun-

tamiento or municipality. This is sufficiently apparent in the three sections of the Act of the Territorial Deputation of California, to which reference is made by plaintiffs, as being found at large on page ten of Wheeler's Land Titles of San Francisco. These three sections are but a small portion of an Act, in twenty-one sections, made to provide municipal funds for the Ayuntamientos of California. The 1st Section requires them to apply through the ordinary channels to have lands assigned to each pueblo for *egidos* and *propios.* It is in these lands only that the pueblos could have a right of property. The 2d Section says, the *propios* assigned to each pueblo shall be subdivided into middling sized and small portions, and may be rented out, or sold at public auction, subject to an emphyteutic rent or tax. The present possessors of the lands belonging to the *propios* will pay an annual tax, to be imposed by the Ayuntamiento, the opinion of three intelligent and honest men being first taken.

The 3d Section speaks of other lands than those in which the the pueblos have been given an interest. These were the *solares para formar habitaciones,* the house-lots which were given by the nation, by the decree of its Constituent Congress of August 18, 1824, and the regulations of November, 1828. These grants were gratuitous on the part of the nation, but the Territorial Deputation undertook to tax them, by the 3d Section of the Act cited, for the purpose of forming a municipal fund.

Among the measures initiated in Figueroa's time, for the better organization of the territory, was this : *Plan de propios y arbitrios para fondos municipales de los Ayuntamientos del Territorio de la Alta California.* The Committee in the Territorial Deputation, to whom this matter was referred, appear to have consulted the Ayuntamientos, at least that of Monterey, the Capital, and to have received some suggestions, and, thereupon, to have framed a bill which was reported to the Deputation, and was there under discussion in July, 1834. In a bound volume in the archives in the office of the Surveyor-General, entitled, Legislative Records, Vol. 2, 1834, 1835, at p. 173, we find a discussion of the first proposition of the report of the committee, as it then stood, in these words : *"En la concession de solares se cobrarán dos reales por vara cuadrada."* "In the grant of town lots, there shall be collected two reales the square vara."

It was objected to by a member as excessive. The President said it was true the Ayuntamientos have demanded the approval of the tax under discussion, (*han pedido se apruebe el arbitrio sobre que se discute;*) that it was just, as being destined to the public municipal expenses, and ought not to be burdensome to the parties, inasmuch as they acquired a right to the land without its costing them anything, which does not happen in other places; *porque adquieren un derecho al terreno sin que les cueste nada, cosa que no sucede en otras partes;* still he agreed with the member in thinking the charge excessive, and the article was recommitted and finally adopted in the form in which it appears in Wheeler, p. 10, Art 3.

The conclusion is that the Deputation, and Figueroa who presided over it, looked upon this *arbitrio* or *derecho*, as a tax levied upon town lots, for town expenses, and not as a price or consideration, total or partial; that they moreover acted upon the acknowledged fact that the nation was the grantor of these lots, not the pueblos, and the grantee got them from the nation without any price or consideration, *sin que les cueste nada.*

In the *diccionario judicial*, in the last volume of Febrero, the word *derecho*, is defined, *el impuesto que se carga á las mercaderias, o comestibles, á las personas y tierras por contribucion;* "the impost laid upon goods or provisions, persons and lands, by way of tax or contribution;" and *arbitrios* are defined, *los derechos que muchos pueblos imponen ó tienen impuestos, con la facultad competente, sobre ciertos géneros ó ramos para satisfacer sus cargas ó cubrir sus gastos;*" "the duties which many pueblos impose, or have imposed, with proper authorization, upon certain effects or occupations in order to defray their charges or pay their expenses."

In the other articles various duties were imposed for the benefit of the municipal fund, for instance, upon ships, a certain sum for every package landed, upon clothing stores, a certain sum monthly, etc. The 19th Article provides that in consideration of the urgent need of funds for the ordinary expenses and preferable works of the pueblos, in conformity with the 4th *Artribucion*, 335th Act, of the Constitution in force, and with the previous assent of the *Gefe Politico*, they shall avail themselves of the imposts, (*arbitrios*,) granted in Articles 3—18, inclusive, which the said *Gefe Politico* will order to be observed in the usual terms.

The 20th Article provides that the Supreme Government shall be informed of this "plan," and the approval of the general Congress solicited.

Thus the grant under which we claim, in the use of the words "derechos municipales," the Act of the Territorial Deputation in the use of the term "arbitrios," with inclusion of the 3d Article, Figueroa, in the discussion in the Territorial Deputation, while presiding over it, in the use of the same term arbitrios, as expressive of this particular impost, as well as in declaring that grantees ought to be willing to be taxed, inasmuch as they got a title to the lot without its costing them anything, which was not the case everywhere, have left no pretext for saying that this municipal tax was a price, a consideration, or that the pueblos had any lots to sell, except the propios which might be previously granted and designated to them as such, and then, only in small subdivisions, on a ground rent, and at public auction.

But even if donations are burdened with very onerous conditions, involving the payment of money, by the community, equal to the value of the property, still the title remains in the consort, in whose favor the donation is made. And the community is indemnified out of the separate property. The lot, with the improvements made out of common funds, goes to the donee of it. (3 Sala Mejicano, 59, No. 26 ; Law 9, Tit. 4, Lib. 3, Fuero Real ; Villadiego, Instruccion Politica, 259, No. 10 ; Louisiana Code, Art. 2377 ; Frique v. Hopkins, 4 Martin, N. S. 221 ; Babin v. Nolan, 2 Rob. La. 278 ; 6 Id. 508 ; 10 Id. 373, 380 ; Waggaman v. Zacharie, 8 Id. 181, 187.)

For examples of other expenses and charges attending the acquisition of separate property which may be defrayed by the community, without drawing to it the title to the property, see Escriche, Verb. Bienes Gananciales ; 3 Febrero Mejicano. Ch. Bienes Gananc. 217, et seq. No. 17 ; 3 Sala Mejicano 59, No, 26 ; L. Molina, de Justitia et Jure, Vol. 2 ; Disput. 433, No. 11 ; Barbet v. Langlois, 5 La. Annual, 212 ; Pargoud v. Pace, 10 Id. 614 ; Succession of Morgan, 12 Id. 153 ; Lawson & Wife v. Ripley, 17 La. 238, 251.

There never has been any question among the commentators on the Spanish law that donations to one of the consorts were

the separate property of the donee, unless the donation were
the reward of services rendered in the King's service, without
pay, and at the expense of the community. (*Frique* v. *Hopkins,*
4 Mart. N. S. 215, 216.) But even this exception is not admitted
by all Spanish commentators with respect to donations, and
seems to have been denied in a decision of the Chancilleria de
Valladolid, in the case of Dr. Montalvo. The King had given
him certain annual rents, amounting to thirty thousand marave-
dis, as a reward for his merits and services; *en attencion á sus
méritos y servicios.* The children of the doctor, at the death of
his wife, their mother, brought suit for the one-half of the right
of the property in these rents as well as for one-half of their
product or fruits. The right of property was held to be in the
father; the fruits, that is, the installments of the pension or an-
nuity, which had fallen due during the marriage, were common,
and the children, as heirs of the wife, entitled to one-half of
them. This decree was made with the assistance of Palacios
Rubios, a commentator upon the laws of Toro, who sat in the
Cortes of Toro, and took part in the revision made of those
laws, before their publication. Matienzo, in his commentary
upon the laws of the Recopilacion, (Glosa 6, Law 3, Tit. 9, Book
5,) the second law above translated, cites this decree as author-
ity, and the similar opinion of Arias Pinelo. Llamas y Molina,
the most recent commentator upon these laws, agrees with them,
and shows how the exception, noticed by the Supreme Court of
Louisiana, in the passage cited from *Frique* v. *Hopkins,* had its
origin in a misconception of the law of the Fuero Real. The dis-
tinction made there between one who serves with pay, and one
who serves without it, and at the common expense, does not ap-
ply, as he well maintains, to donations, but to *lo que ganare en la
hueste del rey ó de otros,* what he gains in the army in the field
from the spoils of the enemy. We shall quote and translate a
portion of his remarks, because they dispose with great force of
reason of the pretense, that colonization grants must be consid-
ered a reward to the colonist for the trouble and expense of colo-
nizing, settling, and improving, the land granted, and must,
therefore, be common to the two consorts, although made to one
only. (Ley 77 de Toro, Comentario, Sec. 23, Vol. 2, p. 512, 3d
Ed. Madrid, 1853.)

Translation:

"Sec. 22. It is not to be thence inferred that there will never, therefore, be room to apply the distinction the law makes between what the husband gains in war, going for pay, and when he goes without it, and lives upon the community, if, whenever the Prince makes him a donation in reward of his services, it is always to be understood to be the husband's, and not to be shared with the wife; and the reason is, that the law does not speak of the donation the Prince makes the husband in remuneration of his services, but of what the latter gains in the army from the spoils of the enemy, as is clearly shown by the words the law employs, to wit: 'If the husband gain anything in the army of the King, or another.' There is no repugnance in observing the distinction in this case, when the law clearly expresses it; and being governed, in the case of the donation, by the doctrine above stated, for the reasons given, and for the difference that is obvious between gaining in the army in the field, and gaining or acquiring by donation.

Sec. 24. In marked support of this are the words of the second law of this same title, which are: 'And if it be a donation from the King, and he gives it to both, let husband and wife have it; and if he give it to one of them, let that one alone have it to whom he shall give it.' Hence it appears that the law assumes that donations must be the separate property of the one to whom they are made, and that it cannot be pretended that said law speaks of pure donations, and not of remuneratory ones, because, on the contrary, the presumption is rather that it should be understood of remuneratory donations; and the reason is, because the law speaks, as its words show, of donations that the King makes, and it is not to be believed that the King, as a faithful administrator of the public revenues, makes donations of them with no other object than that of exercising his liberality; on the contrary, the experience of every day shows that Princes practice these liberalities only with those who have distinguished themselves by their services to the crown."

Llamas y Molina adds many other sound arguments to these in support of the opinion which he shares with Arias Pinelo, Matienzo and Palacios Rubios, all confirming the decree in the

*Case of Montalvo,* which he also cites in Sec. 20 of his Commentary on Law, 77.

As to the Louisiana grants, and the law governing them, see the General Regulations of the Code of the Indies, those made by O'Reilly, Gayoso de Lemos, and the Intendente Morales, to be found in 2 White's Recop. 228, 244. The general laws of Spain made all grants subject to the condition of occupation and improvement. (Recop. de Indias, Book 4, Tit. 12, Law 3, 2 White 50; also Book 4, Tit. 2, Law 11, 2 White, 51.) The great body of rural grants on the river Mississippi had conditions. (2 White, 229.) So burdensome in some cases that the grantees abandoned their grants. (*Bossier* v. *Metayre,* 5 Martin, 678; *Pontelba* v. *Copland,* 3 La. An. 86—87; *Kenton* v. *Pontalba,* 1 Rob. La. 355—356.) That the Louisiana grants were on condition, see *Fremont's Case,* 17 How. 554; *Menard's Heirs* v. *Massey,* 8 Id. 293, 314, appendix to the opinion of the Court, where a complete Spanish grant is given; and for the instructions referred to, see 2 White, 235—236. As to conditions of front clearing, the road and levee, see *United States* v. *Moore,* (12 How. 209, 221.)

The grant in *Frique* v. *Hopkins* was of a town lot; in *Gayoso* v. *Garcia,* 1 Mart. N. S. 334, and in *Rouquier* v. *Rouquier,* 5 Id. 98, of rural property. If the Courts of Louisiana failed, in all those cases, to notice conditions imposing burdens upon the community, it was not because the conditions did not exist, but because, in their view of the law, the question of title was unaffected by the circumstance, and the rights of the community amply protected in the mode above explained.

FIELD, C. J. delivered the opinion of the Court—BALDWIN J. and COPE, J. concurring.

This is an action of ejectment, to recover the possession of a fifty vara lot, situated in the city of San Francisco; and the facts upon which it arises may be briefly stated as follows: In 1843, Noé, the elder, received a grant of the lot from a Justice of the Peace of the jurisdiction of San Francisco. At the time Noé was intermarried with Guadalupe Garduña. In 1848, Guadalupe died, leaving six children as the issue of the marriage— all of whom, with one exception, are still living. After her death, Noé sold the property in parcels—part in 1849, to one

Gurley, and part in 1856, to the defendant, Leon—for its full value, and executed deeds to them. Noé entered into the premises under his grant, and remained in their occupation until he gave the conveyances named, with which he delivered to the grantees possession of the parcels respectively sold to them. Leon, and the parties claiming under Gurley, compose the defendants; the plaintiffs consist of the five surviving children of Guadalupe, Noé himself, as heir of the deceased child, and parties who have acquired a half interest in the claim of the other plaintiffs to the property.

The plaintiffs rely for recovery upon two grounds: 1, that the land granted to Noé constituted property of the community existing at the time between himself and wife; and, 2, that as community property, one undivided half vested absolutely in the children, upon the death of the wife, and was not subject to the disposition of the surviving husband.

On the other hand, the defendants controvert both of these grounds, insisting that the land was the separate property of the husband, Noé; and if this were otherwise, and it belonged to the community, that still the property was subject to his disposition after the death of his wife.

It is conceded by the counsel of the plaintiffs, and such was clearly the law in force in California at the time, that if the lot were the separate property of the grantee, his absolute power of disposition was not in any respect affected by the death of his wife. His sales, in that event, were valid, and judgment must pass for the defendants. The character, then, of the property, whether the separate property of the husband, or the community property of husband and wife, is the first question for consideration; and upon its solution will depend the necessity of examining the other positions taken by the parties.

By the Mexican law in force at the time must the question be determined. By that law, as we have stated in *Scott* v. *Ward*, (13 Cal. 458,) all property acquired by husband and wife during the marriage, and while living together, whether by onerous or lucrative title, and that acquired by either of them by onerous title, belonged to the community; while property acquired by either of them, by lucrative title solely, constituted the separate property of the party making the acquisition. By

Noé *v.* Card.

onerous title, was meant that which was created by a valuable consideration, as the payment of money, the rendition of services, and the like, or by the performance of conditions, or payment of charges to which the property was subject. "Thus, we call onerous," says Escriche, in defining the term, "the disposition which is made on condition that he who accepts shall do, give, or pay, something," (Dictionario, Tit. Oneroso,) and onerous title, says the same author, "is the cause, in virtue of which we acquire a thing by payment of its value in money, in another thing, or in services, or by means of certain charges and conditions, to which we subject ourselves, as purchase, exchange, renting, and dowry." By lucrative title was meant that which was created by donation, inheritance, or devise. The inquiry then arises, whether the premises conveyed by the grant to Noé were held under a lucrative or onerous title—in other words, whether they were acquired by donation, or by the performance of conditions of such a nature as to constitute a valuable consideration to the government.

The grant in question was issued upon the petition of Noé, in which he requests the officer, in the exercise of the authority vested in him, to concede the property, stating that he (Noé) required the same in order to erect a house. And the officer, in consideration of the petition and by virtue of his authority, makes the concession. The request made in the petition is not to purchase the lot, but that it be conceded to the petitioner, and the officer grants the favor which was requested. Both parties appear to have treated the matter as a donation—sought on the one hand and accorded on the other—not as a contract of sale and purchase. To the grant certain conditions are attached, which are supposed to change the character of the transaction from that of donation into one of sale. The first condition provides that within one year from the date of the grant, the premises shall be fenced, and a house constructed thereon; the second, that the petitioner shall hold the premises subject to the existing municipal laws and regulations, and those which may be subsequently established; the third designates the penalty for nonfulfillment of the first condition, and the consequences of nonconformity with the second; and the fourth requires the payment of the municipal fees established by law. It is only upon

the first and fourth conditions that the plaintiffs rely as giving character to the transaction.

At the civil law, as at the common law, donations may be accompanied with conditions, the performance of which may be required for the possession or enjoyment of the property donated. Thus, as we observed in *Scott* v. *Ward*, a gift of fruits would not lose its character as a gift because accompanied with the condition that the donee should gather them; nor would a gift of land be less a donation because the beneficiary was required to measure off the specific quantity given, and to designate it by metes and bounds.   When the donation is solicited for specific purposes, it may be accompanied with conditions limiting the property to such purposes without changing the character of the act, even when the conditions impose the discharge of expensive and burdensome duties.   Thus, if one should solicit a gift of land in order that he might construct a church or college thereon, and the land should be granted on condition that such church or college be erected, the gift would be none the less a donation for the presence of the condition.

The reason is obvious, and founded on the distinction existing between the inducement or motive for an act and the consideration or price for it.   The erection of the church or college, in the case supposed, and the consequent benefit to the community generally, would constitute the inducement to the act, while a consideration in the nature of a price would be entirely wanting. In the present case, the donee solicited the premises for the purpose of erecting a house.   This purpose is expressed in his petition, and he and his wife and heirs are estopped from denying that he desired it for that purpose.   (*Caldwell* v. *Hennen*, 5 Rob. La. 20.)   It must be taken, then, as true that such was the case. The premises were not, therefore, the less gratuitously given or the less valuable to him, because granted subject to the condition of their appropriation to that end.   The house and fence were to be built for the benefit of the donee, and not for the government.   There was, therefore, no consideration in the performance of these acts, moving to the government, which can be regarded in the nature of a price, which is essential in all contracts of sale.   The condition requiring the construction of a house within a year, was very generally annexed to grants made under the

Mexican Government in California, whether the grant embraced a city lot or leagues of land.   The performance of the condition was exacted in furtherance of the general policy of the republic to induce settlements, and not as a price to the government upon any notions of a sale.

The decisions of the Supreme Court of Texas are cited by the counsel of the plaintiffs in support of the views advanced by them.   These decisions are undoubtedly in their favor.   Thus, in *Yates* v. *Houston*, (3 Texas, 433,) which was the first case involving a consideration of the point, it was held that land granted to a married man, under the Colonization Law of 1823, was to be regarded as community property upon two grounds: 1st, that the Commissioner's fees, office fees, stamp paper, surveying fees, etc. were required by law before the title issued; and, 2d, that the condition of cultivation annexed to the grant was onerous. The amount fixed as fees by the Political Chief of Texas, on the issuance of title, was one hundred and sixty-five dollars, and the Court was of opinion that when the payment of so considerable a sum was required as an indispensable condition, "the grant could not be justly regarded as a *pure* donation."   The second ground was based upon a consideration of the general object of the Colonization Law of 1823—the settlement of the country. The settlement required the labor of one or both of the spouses, and as by the general principles of the law in force at the time, the product of such labor belonged to the community, it was held that the land granted upon the condition of settlement became, by virtue of the services to be rendered, common property of the husband and wife.   "The object of the government in the Law of Colonization," said the Court, "was to settle the vast wilderness of a remote frontier, with a reputable, hardy, and industrious, population.   Agriculture, industry, and the arts, were to be promoted, and to accomplish this, grants of a large amount of land were offered to immigrant families, but not gratuitously, not simply on the ground that they would introduce themselves into the country, but that they should cultivate the lands, and within two years from the date of the concession.   The inquiry then arises, by whom is this to be accomplished?"

"Are we to suppose that the husband is the sole cultivator? that fields are to be opened, and lands stocked with cattle, without

the assistance of his partner, and the expenditure of their joint funds? And, in fact, it seems immaterial whether the whole of the labor and money be bestowed and expended by the husband or not, provided such was the necessary condition and charge by which title could alone be originally acquired, or subsequently preserved. By the principles of the law then existing, the results of the labor of the partners, and of each one of them, became common property. It is of no consequence whether one contribute more than the other to the acquisition, or whether it be procured by the labor and traffic of one alone, it is common to both by virtue of the subsisting partnership, through which their acquisitions are reciprocally communicated."

The error, as we conceive, of this decision consists in regarding the fees paid to the officers, and the services rendered in settling upon the land, as constituting a valuable consideration in the nature of a price to the government. The fees incurred in making the survey and in issuing the title papers were altogether incidental to the grant and formed no part of its consideration, and the services rendered in the settlement were directly for the benefit of the grantee, and only collaterally and remotely for the benefit of the government. (*Chew* v. *Calvert et al.* 1 Walk. Miss. 60.) Agricultural lands solicited under the colonization laws were supposed. to be for use and cultivation by the petitioner, and the grant to him was only subject. to their appropriation to that end. Such limitation could not affect the character of the grant as a donation and convert it into a purchase. The government, in fact, said to the petitioner, if ;you want the lands for use and cultivation, you may have them for that purpose; in other words, we will give them to you if you will use them. Conditions which require the performance of services are not onerous in the sense of the Spanish law, so as to convert the transaction into one of contract, when they are rendered by the grantee for his own benefit; they are only so when rendered for the benefit of the grantor, or parties other than the grantee. They do not differ in that respect from the payment of money, which it would be absurd to say could be made by the grantee to himself. Provisions like these, attached to colonization grants and to the grant of Noé, take from them, it is true, their character as *pure* donations, and render them donations upon condi-

tions. But it is not essential to a donation, as counsel for the plaintiffs appear to consider, that it should be unaccompanied with conditions requiring labor and charges; that in other words, it should be a pure and simple gift.

"Men are sometimes induced," reads the sixth law of the fourth title of the fifth Partida, "to make donations, from certain causes or particular reasons, without which they would not have made them; as, where one man gives another a sum of money, or an estate, expressly declaring at the time he makes the donation, that he gives it, in order that the donee may by that means be always provided with a horse and arms for his service; or where he makes the donation to any artificer, and declares openly that he makes it for certain work or service which the donee was to render him. Wherefore, we say, that if the person who receives a donation in the manner above mentioned, complies with the agreement or condition, or does that for which it was given, the donation will be valid in every respect; but if he should not comply therewith, or faithfully execute that for which it was given, he may be compelled to comply with what he had promised, or to abandon the donation which had been made to him. We likewise say, that if one man give another a vineyard, or garden, or an estate, or any other thing whatever, declaring expressly at the time he made the donation, that he gave the thing with the intention that a certain portion of the fruits arising from it should be given to another person for his maintenance, or to redeem him from captivity, or for any other like purpose, if the donee comply with the object for which it was given, the donation will be valid; and if he should not, the donor may revoke it. And donations of the kind mentioned in this law, are called in latin, *sub modo;* which means, in common speech, a donation made for a certain purpose.—*So otra manera.*"

The decisions of the Supreme Court of Texas are in direct conflict with those of the Supreme Court of Louisiana. Thus, in *Gayoso de Lemos* v. *Garcia*, (1 Martin, N. S. 333,) where it was argued that a grant of land by the King of Spain to the father of the plaintiffs during marriage, entered into and made a part of the community subsisting between husband and wife, the Court said: "Whatever support the argument may derive from

39

the practice which we believe has prevailed in some parts of the State, to regard lands granted by the sovereign as property common to both spouses, it is certain that it is not only unsupported by authority, but that the law most positively says it shall not be common to both, but that it shall belong exclusively to the individual to whom the King grants it." (Novissima Recop. Liv. 10, Tit. 4, Leyes 1, 4, y 5, Febr. 1.)

The law to which reference is thus made, and upon which the decision appears to rest, provides that whatever is given by the King, or another, to both husband and wife, shall belong to them jointly, and that which is given to one of them shall belong to the individual to whom it is given, and this law is held by the commentators to apply to all cases coming within its letter, except those where the King gives in remuneration of services rendered by the husband in the field, when supported at the expense of the community. This law cannot be considered as applying to pure donations merely, and not those which are remuneratory, because, as says one of the commentators, "it is not to be believed that the King, as a faithful administrator of the public revenues, makes donations of them with no other object than that of exercising his liberality; on the contrary, the experience of every day shows that Princes practice those liberalities only with those who have distinguished themselves by their services to the crown." (Llamas y Molina, Comentario, Ley 77, de Toro, Sec. 24, Vol. 2, p. 512.)

In *Frique* v. *Hopkins et al.* (4 Martin, N. S. 214,) it was also insisted that the land granted to the ancestor of the plaintiffs by the King of Spain, was common property, but the Court affirmed the ruling in *Gayoso* v. *Garcia,* and held that the land was the separate property of the individual to whom it was granted. To the position that the object of the grant under the Spanish Government was to encourage the settlement of the country, and that, to carry that object into effect, the land should be considered as given to both husband and wife, the Court, in its opinion, said: "To this it might be answered, and with great force, that if the government were of that opinion, it is strange they did not at once say so, and by making the concession in the name of both, place the matter beyond doubt; and not by granting it to one of the spouses, leave it to the operation of a

positive law, which repelled the idea. But if we could enter into political considerations, in order to ascertain whether they could repeal statutes, we would, in this case, be led to the examination of a nice and refined question of policy, in relation to the effect on national prosperity, of giving to the wife a distinct interest in the property acquired during marriage; one on which men would be found to differ, according to their education and particular modes of thinking. Some nations, whose fate has been as prosperous as those of any community, with whose history we are acquainted, proceed on an entirely opposite principle, and act on the idea, that domestic felicity, and consequently public happiness, are best promoted by considering the acquisitions made during coverture, as belonging to the husband alone.

It is true, that Spanish law viewed this matter in a very different light, but the same law makes a positive exception in respect to donations, and the political consideration is surely not so clear as to authorize us to make a distinction where the legislator has made none. On the contrary, it may be as readily conceived that those to whose care the colonization of this country was intrusted, thought strangers might be invited into it, and settlements formed with as much facility by giving all the land to the husband, as by giving it to the husband, wife, and children. The father, as head of the family, had a right to select his place of residence; the wife was bound to follow him. It was natural he should go to that place where the most advantages were conferred *on him;* where he knew, in the event of losing his life, from the perils and sufferings of a first settlement, that the objects which induced him to come there would go to his children, and not be divided with those of another bed, in case his wife survived him and married a second time.

But whether these views be correct or not, we feel satisfied that the reasoning which might be opposed to them, is not of sufficient weight to allow us to decide contrary to the express and positive provisions of the law.

Nor do we think that the circumstance that these lands being, in general, waste and uncultivated, makes any difference in the right of property. The augmentation of value given by the common labor makes a part of the *acquets and gains,* and the wife has a right to the one-half the value of the improvements,

as she would if they had been made on any other property be-
longing to the husband, but her right in the ameliorations made
*on this property* is quite distinct from a right *to the property.*"
(Febrero, 2, Lib. 1, Cap. 4, Sec. 4, Nos. 74, 75; Civil Code, 338,
Art. 70.)   To the same effect is the decision in *Heirs of Rou-
quier* v. *Executors of Rouquier,* (5 Martin, N. S. 98.)  In *Frique* v.
*Hopkins et al.* the grant was of a town lot, but in the other two
cases, the grants were of rural property.

To these Louisiana decisions the counsel of the plaintiffs reply,
that the grants, upon which they were made, do not appear to
have been accompanied with any conditions, precedent or sub-
sequent; that no reference is made to any such conditions either
in the arguments of counsel or in the opinions of the Court, and
that it is impossible to believe that had they existed, the fact
would have escaped notice; that the decisions do not, therefore,
impair the force of the Texas cases, where the grants were upon
conditions which imposed labor and charges, and upon the non-
performance of which the land granted was liable to forfeiture.

It is true, there is no direct mention in the decisions cited, of
any conditions to the Louisiana grants, and for the reason, it is
probable, that little importance was attached to their existence.
But in point of fact, such grants were accompanied by condi-
tions, necessarily attached to them by force of the laws and reg-
ulations on the subject existing at the time.   All Spanish grants
in Louisiana were governed by the code of the Indies, or the
regulations of O'Reilley, the instructions of Gayoso de Lemos,
or the regulations of the Intendente Morales.   The law of the
Indies required settlement and improvement within a specified
time, under penalty of forfeiture.   (Recop. de Indias, Lib. 4, Tit.
12, Law 3; Lib. 4, Tit. 2, Law 11; 2 White's Recop. 50, 51.)
The regulations of O'Reilley required the grantee to clear and
inclose, within three years, the entire front of his land, unless
the same were situated on the borders of the Mississippi, in
which case, he was required, within the like period, to erect
mounds sufficient for the preservation of the land, and ditches
necessary to carry off the water, and to keep roads in good re-
pair, with bridges over the ditches crossing the same, and also,
to clear the entire front of his land to the depth of two arpens;
and a failure to comply with these conditions caused the lands to

revert to the sovereign. · (2 White's Recop. 229; Regul. Arts. 2, 6.) The instructions of Gayoso required the grantee to commence an establishment upon his land within one year, and to put under labor ten arpens in every hundred within the third year, under the pain of absolute loss of the land. (2 White's Recop. 233, Instru. 14.) By the regulations of the Intendente Morales, the grantees were obliged, under the like penalty, to clear and put in cultivation, within three years, the entire front of their lands, to the depth of two arpens, and those who obtained concessions on the bank of the Mississippi were also required, in the first year of their possession, to construct *levees* sufficient to prevent the inundation of the waters, and canals sufficient to carry off the water when the river was high, to make and keep in order a public highway thirty feet in width, and to construct bridges of fifteen feet over the canals at the crossings of the roads. (2 White's Recop. 235.) The conditions thus attached by the provisions of the law and regulations, to which we have referred, were, of course, more or less burdensome, according to the situation of the land. In numerous instances, where the land was situated upon the Mississippi, the labor of making and keeping in repair the levees, canals, roads, and bridges, was so great, that the parties abandoned their grants. In *Pontalba* v. *Copland,* (3 La. Ann. 86,) the Court says: "It is a historical fact, that during the colonial existence of Louisiana, grants of land were frequently relinquished by the grantees, for the purpose of avoiding the charges which they imposed, and that the lands thus granted were reunited to the general domain." In *Boissier et al.* v. *Metayer,* (5 Martin, 678,) the grant was issued in 1789, when the regulations of O'Reilley were in force, and the Court refers to the "reservation made *in every provisional grant,* that the grant should be null if the grantee failed to *execute its conditions.*" In the *Fremont Case,* Chief Justice Taney, in speaking of grants in Louisiana and Florida, says: "These grants are almost uniformly made upon conditions of settlement, or some other improvement, by which the interest of the colony, it was supposed, would be promoted."

What we have said is sufficient, we think, to show the error of the counsel of the plaintiffs in supposing, that the grants in Louisiana were without conditions as burdensome upon the

grantees as any conditions attached to the grants in California, issued under the colonization law of 1824, and the regulations of 1828. The conditions in the former cases imposed heavy charges, but the grants were not the less, on that account, treated as donations, and the land as the separate property of the consort to whom it was given. Labor or expenditures, incurred for the preservation or improvement of separate property, did not, under the Spanish law, operate to change its character. They only created a charge against the same, which was allowed in the liquidation of the community. The buildings and other improvements went with the property to the separate owner, and their cost only was allowed to the community. The character of the land, either as separate or common property, was determined by the terms of the grant, whether made to one of the spouses, or to both, and the title continued in the direction it originally received, without reference to expenditures subsequently incurred. The illustrations given in the brief of the counsel of the defendants, place the general doctrine of the Spanish law in a very clear light. Thus, if land sold before marriage, subject to a right of redemption, be redeemed after marriage, with funds of the community, the property belongs to the consort who was the original owner, and not to the community; but the latter, upon its settlement, will be a creditor of the owner for the amount expended in the redemption. (Escriche, Verb. Bienes Gananciales.) So, also, if one of the consorts exchange his or her separate property for other property of greater value, and pays the difference with funds of the community; or if, in partition of an undivided interest in property, he or she receives a more valuable share than an equal portion, and pays the difference with the common funds, the property received is separate property, and a charge for the difference paid exists against it in favor of the community. (3 Sala Mejicana, 59, No. 26.)

The cases of *Barbet* v. *Langlois,* (5 La. Ann. 212,) *Succession of Morgan,* (12 Id. 153,) and *Lawson & Wife* v. *Ripley,* (17 La. 238 —251,) are instances of the application of the doctrine of the Spanish law. Those cases, it is true, were decided upon the provisions of the code of Louisiana, but those provisions were in accordance with the previous rule of the Spanish law. In *Barbet* v. *Langlois,* the plaintiff claimed, as heir of her deceased husband,

an undivided half of a tract of land, purchased by him during the marriage. At the time of the marriage, the husband possessed a tract fronting on the Bayou Plaquemine, and by virtue of the Act of 1811, revived in 1820, he was entitled to a preference in purchasing vacant land adjacent to his own tract, to a depth of forty arpens. This preference he asserted after marriage, and purchased the land in question. The Court considered the cause of the privileged acquisition as existing before the marriage, and held the land to be separate property. "The only right of the community," said the Court, "was to a reimbursement of the money paid for it, if it was paid out of the funds of the community." In *Lawson & Wife* v. *Ripley*, the husband owned certain property at the time of his marriage. The purchase was made before marriage, but not entirely paid for, and the deed was taken afterward. The Court said: "If the husband owed any part of the price, and paid it during the marriage out of the common funds, this may be a charge against him in favor of the community, but he is, nevertheless, entitled to the land as his separate property."

So, too, in the present case, whatever was expended by the community, existing between Noé and his wife, in performing the conditions attached to the grant, constituted only a claim in its favor against the separate estate of Noé. That claim in no respect affected the separate character of the property granted. That character was impressed upon it by the terms of the grant itself, by the fact that the grant was made to himself alone. The subsequent improvements by the community, made for the preservation of the property, could have had no greater effect upon the title, than the payment of money by the community for the preservation of property already vested in one of the spouses. Such payment, as we have seen, had no operation upon the direction of the title.

There is nothing, then, in our judgment, in the conditions attached to the grant to Noé, which changes the nature of the transaction from one of donation into one of sale.

Nor do we perceive anything in the requirement contained in the fourth condition for the payment of the municipal fees established by law, which changes the character of the grant, and takes it out of the catagory of donations. Those fees were im-

posed as a tax for the purpose of raising municipal funds for the Ayuntamiento, and not as a consideration in the nature of a price for the lot. The tax was laid in pursuance of the 3d Section of the Act of the Territorial Deputation of California, passed in August, 1834, which provides that "for the grant of a house-lot for building on, the parties interested shall pay six dollars and two reals for each lot of one hundred varas square, and in the same manner, for a larger or smaller quantity, at the rate of two reals for each vara front." Noé paid the one hundred reals for his fifty vara lot—twelve dollars and a half—and this payment the learned counsel of the plaintiffs regard as a pecuniary consideration for the grant, and as conclusive of the point that the transaction was one of sale. There would be much force in the position, if the section cited were considered by itself, independent of other sections and the general object of the Act; but when the entire Act is considered the position will be found without support. The object of the Act was to provide municipal funds for the Ayuntamientos of California; and for that purpose taxes were authorized upon ships, packages landed, clothing stores, and the like, and also upon lots granted, according to their extent; and it is to a tax of this nature, that the 3d Section refers, when it provides that for every grant of a lot, two reals for each vara front shall be paid. It would appear from the brief of counsel that the term translated as fees, is in the Spanish *derecho.* If this be so, it is only a confirmation of what we consider as otherwise sufficiently clear. The term, *derecho,* is defined by Febrero, in his last volume, as "the impost laid upon goods or provisions, persons or lands, by way of tax or contribution." It is clear that the exaction of the fees received, as municipal taxes merely, could not have had any effect on the general character of the grant as a donation. A tax upon the transfer of property, cannot, of course, affect the nature of the transfer; nor can a tax upon property, at the time of its transfer, have a greater or different operation than a tax upon the same property after the title has vested. The tax, in the present case, only differed in the application of its proceeds to the purposes of the Ayuntamiento, from that general tax upon the transfer of land, which constituted an important branch of the revenues of the Spanish crown and Mexican Republic. (See *Hoen* v. *Simmons,* 1 Cal. 122.)

Noé v. Card.

The conclusions, to which we have thus arrived, render it unnecessary to consider whether the husband, upon the death of the wife, possessed any power to dispose of community property, as the question, from the views we have expressed, is immaterial to the determination of the present case.

It only remains to notice the position of the plaintiffs, that they are entitled, in any event, to judgment against the city and county of San Francisco, upon the disclaimer and consent contained in their answer. A disclaimer of possession or interest in real property is not a proper proceeding in an action of ejectment; it is only proper in actions brought to determine estates or interests asserted against parties in possession by parties out of possession. Thus, had the plaintiffs been in possession, and brought their action to determine an interest claimed adversely to them by the city and county, the disclaimer would have been a proper basis for a judgment. But such is not the present case. This is an action of ejectment, and the disclaimer only amounts to a denial of having any possession of the premises at the commencement of the action, or of having asserted any claim to them. If the plaintiffs relied upon such a disclaimer, they should have entered a nonsuit as to the city and county. A judgment in ejectment cannot be entered against a party unless he was in the possession, actual or constructive, of the property at the commencement of the suit. (*Garner* v. *Marshall*, 9 Cal. 268.) It is upon such possession, wrongfully detained, that the action rests. For past possession without right, trespass may lie, but not ejectment.

The case, then, amounts to this: the plaintiffs have not established any right to the possession of the premises, and the city and county of San Francisco admit that they were never in possession, and that they do not and never have asserted any right to the same. Upon this admission, taken as true, no judgment but one of nonsuit could be entered. A judgment for the possession would be in the face of the admitted fact, which itself precludes such recovery.

Judgment affirmed.

On the petition for rehearing, the following opinion was delivered by FIELD, C. J.—BALDWIN, J. concurring:

There are no positions advanced in the petition for a rehearing which were not presented in the original briefs in the cause. The passage which the counsel has selected for criticism, and which, when cited in the brief of the adverse party, he considered as embodying so palpable an error that he refused to notice it, is nothing less than a quotation from the sixth law of the fourth title of the fifth Partida. That law was cited to show that donations might be accompanied with conditions without losing their character as gifts. The same law was cited in *Scott* v. *Ward* for the like purpose, and was preceded by the observation that it would seem that, under the Spanish and Mexican law, a more comprehensive meaning was attached to the term "donation" than the one usually given to it in our jurisprudence, as conditions were sometimes annexed, which would be regarded at common law as changing the character of the transaction from one of gift to one of purchase. We are persuaded that the learned counsel has not read with care the opinion delivered in this case, which he desires us to reconsider, as we cannot suppose, had he done so, that he would have fallen into so great a mistake as to have attributed to the Court the language quoted, or have characterized as so palpably erroneous as to be undeserving of notice any law contained in the code so justly celebrated as the Partidas.

Under all systems, donations are of three classes—pure, remuneratory, and conditional. They are pure when made without condition, in the exercise of a spirit of liberality, as charities. They are remuneratory when required by no legal obligation, but are made from a regard for services rendered. Such are pensions; such was the character of the grants of land made in many instances to officers of the revolution. They are conditional when accompanied with provisions, intended to secure the purposes for which they are made. These provisions may often impose the discharge of burdensome and expensive duties · without changing the character of the transactions. Grants of land for institutions of benevolence, or instruction, for hospitals, schools, asylums, and the like, are generally of this class. Conditions annexed to such grants, that the institutions shall be established, only operate as a requirement, that the lands shall be appropriated to the purposes for which they are granted. The

performance of the conditions does not constitute a considera-
tion in the nature of a price, thereby converting the transac-
tions into sales.    This is so obviously true as to require no ar-
gument for its support.

The counsel appears to be impressed with a conviction that
the annexation of conditions, which require labor or expendi-
tures, necessarily converts grants into sales.    That such is the
effect only of conditions, the performance of which is for the
benefit of the grantors or persons other than the grantees, we
think we have shown in the opinion already rendered.    There
is nothing new advanced on that subject in the petition for re-
hearing, which we have not there sufficiently considered.

The counsel is mistaken in supposing that the paper sent from
Louisiana shows that the grant in *Frique et al.* v. *Hopkins* was
without conditions.    A copy of that paper is filed in *Scott* v.
*Ward,* and appears to be merely an extract from the grant;
only so much of the instrument having been before the Supreme
Court of Louisiana as was necessary for the decision of the case.
As we stated in our opinion, conditions were necessarily attached
to the grants in Louisiana by force of the laws and regulations
on the subject existing at the time, and it would be of little mo-
ment whether they were expressed in the instruments or other-
wise.*

---

\* The following is a translation of the grant considered in *Gayoso de Lemos* v.
*Garcia* (1 Mart. N. S. 333.)   The grant is preceded by the sketch, or figurative plan
of the property, and the certificate of the Surveyor referred to therein :

"G R A N T.

Don Francisco Luis Hector, Baron de Carondelet, Knight of the Order of St. John,
   Field-Marshal of the Royal Armies, Governor and Commandant-General, Royal
   Vice-Patron of the provinces of Louisiana and West Florida, Inspector of the
   veteran troops and Militia thereof, etc.

Having examined the foregoing statements made by the Surveyor of this
province, Don Carlos Trudeau, concerning the possession which he has given to the
Brigadier of the Royal Armies, Don Manuel Gayoso de Lemos, of the quantity of
one thousand arpents of land in superfices, situated in the district of Baton Rouge
at six hundred toises in distance to the east of the Fort, bounded on the side of
the north by land of José Cabo and Don Samuel Steer ; on the south by land of
Don Francisco Deverges and Madame the widow of Fuselier, and on the side of
the east, by lands that are vacant, and of the domain of his majesty, as the forego-
ing figurative plan shows it ; finding it to be conformed to the order of surveying,
and to the grants of the aforesaid contiguous proprietors, without causing them any

We did not pass upon the question supposed to be decided in *Panaud* v. *Jones,* as to the power of the surviving husband over the community property, as any consideration of that question was unnecessary for the determination of the case before the Court. It is not our habit to notice every point raised by counsel, unless required for the disposition of the case. The positions taken by the Respondents as to the alleged misjoinder of parties, and the alleged champerty of some of the plaintiffs, were for like reasons passed by in silence.

Rehearing denied.

---

damage whatever, and without any reclamation on their part; on the contrary, with their consent, as is proved by their presence at said operations, approving them as we approve them.

In the exercise of the power which the King has conferred upon us, we grant in his royal name, to the above mentioned Don Manuel Gayoso de Lemos, the said one thousand arpents of land in superfices, in order that he may dispose of them as his own property, and enjoy the use thereof, conforming himself to the aforesaid proceedings, *and observing the conditions prescribed by the regulation on the subject.*

We give the present signed with our hand, sealed with the seal of our arms and countersigned by the undersigned, Secretary for his Majesty of this government, at New Orleans, the seventh of May, seventeen hundred and ninety-seven.

[L. S.]    (Signed,)    THE BARON OF CARONDELET.

By order of his Lordship, Andres Lopes de Armesto."