JAMES FULLER, MARY F. GOUGH, AND HER HUSBAND RICHARD J. GOUGH v. GEO. N. FERGUSON et als.

GRANT TO A HUSBAND OF A LOT IN A PUEBLO.—By the Mexican law in California before its cession to the United States, the grant of a lot in a pueblo made by an alcalde to a married man, vested the title in the husband as his separate property.

MONEY EARNED BY WIFE'S LABOR.—By the Mexican law, money, the fruit of the wife's individual labor, became the community property of the husband and wife.

PROPERTY ACQUIRED BY HUSBAND AND WIFE.—By the Mexican law in force in California prior to its acquisition by the United States, all property acquired by husband and wife during the marriage and while living together, whether

acquired by lucrative or onerous title, and that acquired by either of them by onerous title, belonged to the community.

SAME.—By the Mexican law in force in California before its cession to the United States, property acquired by either husband or wife while living together, by lucrative title solely, constituted the property of the party making the acquisition.

PROPERTY PURCHASED WITH MONEY EARNED BY WIFE.—By the same law, property acquired by the husband alone by onerous title, though the money paid as a consideration was earned by the wife's individual labor, became the separate property of the husband.

PARTNERSHIP BETWEEN HUSBAND AND WIFE.—By the law of Mexico in force in California before its cession to the United States, the partnership relation existed between the husband and wife in all property acquired by the spouses by their labor, and in the income of the individual property of either, and in the gains of the husband by the exercise of a profession or office, and also in the gains from the money of the spouses, although the capital was the separate property of one of them.

CONTROL OF PARTNERSHIP PROPERTY BY HUSBAND.—By the Mexican law, the husband alone could manage or administer the property of the partnership, and he could sell or dispose of it as he deemed proper, provided he did so without intent to injure the wife.

CONTRACT BETWEEN HUSBAND AND WIFE.—By the Spanish and Mexican law, the husband and wife were considered so far separate persons that the contract of purchase and sale, and any other onerous contract entered into between them, was valid, and the wife needed no authority or consent of the husband when dealing with him, other than that implied from the transaction itself.

WIFE'S INTEREST IN COMMUNITY PROPERTY.—By the Spanish and Mexican law, to the wife is imparted during the marriage a fictitious and revocable dominion and possession of one half the property she acquires with her husband, which dominion and possession she cannot assert during the marriage; but after his death she becomes the absolute owner of the one half which he leaves, in the manner prescribed by law between conventional partners.

SAME.—By the Spanish and Mexican law, if the husband, while the conjugal relation existed, obtained a grant of a lot to him in a pueblo from the Alcalde, and used money belonging to the community, but acquired by the individual labor of the wife, to pay the municipal fees, the wife held his estate charged for one half this money, though its payment could not be enforced during the marriage, and it was competent for the husband during the marriage to render the wife an equivalent for her interest in this money by assigning her half the lot in satisfaction thereof, and the assignment or transfer vested in the wife a legal title to the part thus assigned.

DONATION BY HUSBAND TO WIFE.—By the Mexican law in force in California before its acquisition by the United States, the husband could make a donation to the wife during marriage of a portion of the community or his separate property, and the donation was not void but only voidable; and if not revoked before the death of the donor, and the donee survived, the donation became irrevocable.

FORGED INSTRUMENTS.—If the record discloses the fact that a written instrument introduced in evidence in the Court below was a forgery, the objection may be raised in the appellate Court, although the point was not made in the Court below.

APPEAL from the District Court, Twelfth Judicial District, City and County of San Francisco.

The facts are stated in the opinion of the Court.

*Bennett & Love,* for Appellants.

Only two questions can possibly arise under the Mexican law on the verdict. One is, what interest in the lot granted, Fuller, the husband, took under the grants? We maintain that Fuller took the land granted as his sole and separate estate. He held it the same as if he had owned it before marriage. He, therefore, could dispose of it in the same way, and only in the same way, in which he could dispose of any other property which he owned separately, and not in common with his wife. And the jury have found that the only way in which he undertook to dispose of any portion of his interest was by the division between himself and wife spoken of by them.

And Febrero alleges as the sixth ground on which a partition of land may be annulled the very condition of things under which this partition was made by Fuller. He says in treating of partition of lands, (Febrero, Vol. 5, p. 500, Sec. 13) : " And the sixth cause for which partitions can be assailed and rescinded is, by reason of their having been made with one who was not an heir by any title." And in the same section he gives the reason, saying, " because the *mistake* takes away the *consent* and prevents the acquisition of ownership."

This, it appears to us, is all that is necessary to be said so far as concerns the Mexican law. By that law a *partition* of property not held in common is a nullity. The jury have found a *partition,* or which is the same thing, a *division.* The facts of the case show the property so partitioned or divided to have been *not common* property of Fuller and wife, but the separate property of Fuller, and therefore the partition is a nullity.

In the first place, these fees, though earned by Mrs. Fuller, yet being earned by her during coverture, became the com-

mon property of the community, just the same as if they had
been earned by Fuller himself. This is not disputed. Being
common property, these fees constituted no claim *in favor of
Mrs. Fuller*, either against the common estate or against the
separate estate of Fuller. If any claim whatever could arise
on account of the payment of these fees, it was a claim on
behalf of the *community*, and Fuller, as the husband, had the
entire control over such claim. If due from any one, or to
any one, it was due from or to Fuller himself, as such hus-
band, and he thus having the sole charge, control and disposi-
tion of the common property, it could in no event be due to
Mrs. Fuller individually. Upon the dissolution of the com-
munity by the death of either of the parties, a claim might,
perhaps, exist in favor of the *common estate* against the sep-
arate estate of Fuller. But no such demand could exist until
the *legal* dissolution of the relation of husband and wife. No
such legal dissolution took place during the life of Fuller—
much less at any period prior to the time of the partition or
division found by the jury. (See Schmidt's Civil Law, p. 10,
Arts. 31, 33; Id. p. 16, Arts. 60, 61; Id. p. 15, Art. 56; Id.
p. 257, Art. 1,203.) And *serious difficulties* do not constitute
a ground on which even a separation from bed and board can
be obtained. (See Art. 31, Sub. 7, above cited.) And there
could be no separation from bed and board unless decreed by
a competent tribunal; consent of parties was not sufficient.
(See Schmidt, Arts. above cited.)

How, then, we ask, can it be presumed or assumed that the
partition was made in payment or satisfaction of a claim of
Mrs. Fuller, when no such claim in her favor could, from the
law and facts of the case, have existed? When the claim, if
there was any, must have been on behalf of the community,
and which, if due at all, must have been due to, and under the
control of, and could be satisfied, and the payment thereof
receipted for and acknowledged by Fuller himself, and him
only? Mrs. Fuller had no more authority to make a settle-
ment of a claim arising out of the payment of the municipal
fees than any other stranger would have had. According to

the theory of the defendants, Fuller made this partition in satisfaction of a debt due from himself to himself. For, if any indebtedness existed, he, and not Mrs. Fuller, was legally liable for its payment, and he, and not Mrs. Fuller, was the person to whom it was due and payable, and the only person who could legally acknowledge the payment and satisfaction thereof.

That Mrs. Fuller could have had no claim on account of her having earned the money paid for municipal fees, and that such claim, if any existed, was on behalf of the community, see *Noe* v. *Card*, 14 Cal. 606–7, *per* Mr. Chief Justice Field.

In the case of *Noe* v. *Card*, the necessary inference is, though the fact is not expressly mentioned, that the municipal fees were paid out of community funds, as the grants in these cases were made to married persons. Yet the Court, as it would seem, deemed that fact of no importance, for it is not even noticed in either of the cases.

The case at bar must not be confounded with cases in which property is bought and paid for out of community funds. In such case, lands so bought and paid for would constitute community property, and would belong to both the spouses jointly. In our case, the land granted is treated in law as given by Government to the grantee, and not as having been purchased by him. Such is now the settled law of this State, whatever doubts may have formerly arisen on this point.

To put the case in the strongest light in favor of the defendants, suppose Fuller had made a deed of this land to his wife in consideration of her having earned the money during coverture, which was paid for the municipal fees, can there be any doubt that such a deed would have been void as to the *creditors* of Fuller? No lawyer can hesitate about answering this question in the negative. But a deed void as to *creditors* would be equally void as to the *forced heirs* of Fuller; and legitimate children are forced heirs. (Escriche's Dic. Title "Herederos Forzosos;" *Croijet* v. *Gaudet*, 6. Mart. O. S. 524, 528; *Rachel* v. *Rachel*, 4 Louis, 501, 502; *Terrell's Heirs* v. *Cropper*, 9 Mart. O. S. 351; 5 Louis, 488.)

Again : Even on the theory of the defendants, the plaintiffs are entitled to *one half* of the property in controversy. This position is beyond question, and the reasoning on which it is based is unanswerable, even upon the state of facts supposed by the defendants.

The money paid for the municipal fees was money of the community ; consequently it belonged to Fuller and wife—as much to the one as to the other. If this lot was turned out or made over on the partition, in payment or satisfaction of the claim, it was in payment and satisfaction of a *joint* debt, due to both Fuller and wife. The land thus made over must therefore belong to them jointly, or to Mrs. Fuller, or her grantees, jointly with the heirs of Fuller; but the plaintiffs represent and stand in the place of the heirs of Fuller. Thus, on the hypothesis of the defendants, the plaintiffs must recover one undivided half of the premises. From this deduction, we hazard nothing in saying there is no escape.

Again : It is claimed by the defendants, without one word of proof to that effect, and without any finding of the jury to sustain their position, that the partition or division of this lot was made by Fuller to pay off, satisfy, or extinguish the claim which Mrs. Fuller is supposed to have had on the property by reason of the payment of the municipal fees. It is a sufficient answer to this position of the defendants, that there is nothing in the verdict of the jury to support it.

If Mrs. Fuller had any claim on Mr. Fuller or his estate, on the ground of her having earned the small sum of twenty-five dollars, which was paid for the municipal fees, the verdict of the jury shows nothing from which an inference can be drawn that this claim was paid or satisfied by the partition or division. How can it be pretended that such was the consideration for the partition, when not a word can be found in the verdict finding that such claim on the part of Mrs. Fuller was paid, or satisfied, or extinguished, by the partition? And as the verdict does not find the payment of the claim of Mrs. Fuller to have been the consideration for the partition, such cannot be presumed to have been the consideration.

There having been, then, no consideration for the act of Fuller, the utmost it can be said to have been is a naked donation. But children—forced heirs—are not bound by a donation made to their prejudice. (*Brittain* v. *Richardson*, 3 R. 78, 81; *Ludwig* v. *Linderman*, Id. 99.) Even if this could be considered a donation—which it cannot be—the jury have not found the act of Fuller to have been a donation. And it can be taken to be nothing else than what the jury have found it to have been : that is, a partition or division.

Again : There is another argument which completely disposes of this pretense of a claim of Mrs. Fuller for the municipal fees. If she is to be credited with the amount of these fees as between her and Fuller, on the ground that they were expended on his separate estate, or paid out for his sole benefit, then she should equitably, as well as legally, be charged with her share of the benefit derived from the joint occupation and use of such separate estate. From 1837 to 1849 she lived on the property, and is justly chargeable with her share of the value of the joint use and occupation. Further, if such claim ever had a legal existence, and if it has not been satisfied in the manner just mentioned, it still remains a subsisting demand against the separate estate of Fuller, and payment thereof might be enforced by appropriate proceedings; for, as we have seen, it was not paid or satisfied by the partition made by Fuller as found by the jury. But whether it existed or not, and whether it exists now or not, can in nowise affect the question of title raised in this case.

*Shafter & Goold,* also for Appellants.

The lot being acquired by gratuitous title, became the separate property of the husband, even if the wife had contributed all the funds to pay the Alcalde's fees.

The respondents contend that by this document Madame Fuller acquired one half of the lot granted to her husband. The appellants contend that the document is an absolute nullity ; that the lot belonged to Fuller alone, and that a *division*

of it was impossible. He might have sold, mortgaged, donated, or otherwise conveyed half of it away, but he could not divest himself of it by any such process as is called by the verdict *division*, as the very word implies ownership in two or more persons. He did not donate half of it to his wife; and although he might have gratified her whim or caprice by signing this paper, possibly to silence her, for they quarreled a good deal, he did not, by this process, divest himself of the ownership of one half this lot.

Fuller acquired it by an Alcalde grant. The fees were the property of the community between himself and wife. The acquisition being what is known as a gratuitous, contradistinguished from an onerous title, the property vested in the husband alone. This principle of the Mexican law has been settled in this State, and has ceased to be the subject of discussion. (*Noe* v. *Card*, 14 Cal. 106.)

Respondents rely principally upon the following document:

"*Francisco De Haro, Constitutional Alcalde of the Jurisdiction of San Francisco:*

"Juan Fuller and Concepcion Linares, both married together in the Roman Catholic religion, having a family, appeared before me for the purpose of obtaining between them the right to the lot of one hundred varas square granted to them by the Alcalde, Mr. Martinez, in the Town of Yerba Buena, having agreed upon the same before me and the assisting witnesses to have the same divided in halves, they having paid the fees arising therefrom with their work, there remains to each of them one hundred varas long from north to south, and fifty varas wide from east to west—they mutually agreeing upon their respective portions. And, for their safety, they sign with me, placing the sign of the cross, not knowing how to sign.

"San Francisco, Feb. 4, 1838.

"FRANCISCO DE HARO.

"JUAN FULLER,
"CONCEPCION LINARES, ✠.

           "Witnesses:    "BLAS ANGELINO,
                               "CIPRIAN SIBRIAN."

*Fuller could not owe his wife a debt resulting from his use of the ganancial funds.*

The lot being his, by what contract did he divest himself of it? The respondents say by that which is embodied in the document which is to be construed. It is not pretended that this document is a donation. It is, as is contended, a commutative contract, an onerous contract.

Now, if John Fuller and his wife have been found to have made an onerous contract, what contract was it? There is, under the Mexican system, no possibility of making an onerous contract, unless the agreement be one which may be classified, or which, being not susceptible of a distinct classification, comes within the category of innominate contracts. These, however, require a consideration, present and defined, for, without it, they are treated, as with us, as null and void.

Then, what contract did John Fuller and his wife Concepcion make?

We understand it to be distinctly admitted that this document is not to be considered as a donation. Certainly it has none of the characteristics of that contract. There is seen here no design to give. The parties do not profess to have been moved by the impulses of benevolence or generosity. They say they *divide* the lot. The defendants then must show that the division of property is, under the circumstances developed by the record, valid and binding by the Mexican law. When it is clear, beyond controversy, that the intention to make a certain contract is wanting, no Court will impute such an intention to parties, and thus make for them a contract they never dreamed of making for themselves.

But it is contended that the document may be considered as a giving in payment—*dacion en pago.*

To this the ready answer is, that the very basis of that contract is wanting, to wit: *some debt to pay.* If there was an obligation to pay something, there must have been some one capable of receiving it—some one able to assert and to enforce compliance with the obligation. But could Concepcion Fuller do this as against her husband, John Fuller?

Certainly not. The argument is that she contributed the fruits of her labors toward the payment of the municipal charge for the acquisition of the lot, and that thus a debt was created in her behalf on the part of her husband. It is too well settled to admit of argument that the earnings of both spouses become absorbed in the community of property between them, and that, with regard to the quantity either may contribute, compared with the contribution of the other, the law is purposely silent. The wife may possibly swell the conjugal earnings to an extent a hundredfold greater than those of her partner. But of this excess the law takes no heed. He cannot owe it to her; for all the social earnings are, in the eye of the law, centered in him. They have no other owner; and he can owe nobody for any portion of them.

Now, the adversary argument is that the sum of money put by her into the conjugal coffers, and taken thence to pay these Alcalde's fees, represented a debt which John Fuller afterward extinguished by resorting to the *dacion en pago*. That she owned a portion of the ganancial property, and he who took it from her became indebted to her for the amount. But we propose to show that the wife could not, under any conceivable circumstances, assert as against her husband, that she owned any—the least, the most insignificant—portion of the acquisition of the conjugal association—the *gananciales*. Not only could she not collect any of them, or be paid any of them, as being due her *individually*, but she was absolutely prohibited from pretending to own any portion of them whatever. They all, each and every part and portion, belonged altogether and entirely to her husband himself, as master of the community. (1st Vol. Febrero, pages 225–6, Chap. 10, Secs. 19, 20; Gom. en la 50 de Toro n. 76; en la 60 n. 1, y en la 77 n., y Lib. 2; Var. cap. 5, n. 3; Gregor, Lop. en la 55, tit. 5; Part. 5, glos. 2, vers. Et facit hoc, Corarr. Lib. 3; Variar, cap. 19; L. 47, al fin tit. 28. Part. 3, en las palabras: Otro si decimos, que toda ganancia; L. 5, tit. 9, Lib. 5 R.; 6 5 tit. 4, lib. 10 N.)

The wife is forbidden to assert—must not say—she owns

any of the gananciales property—*no debe decir la muger que tiene gananciales.* If she must not even pretend to assert that any of the community property was hers, how is it that the use of some of it by her husband constituted a. debt in her favor?

The mind cannot appreciate or conceive of the existence of the thing called *debt,* when there is no one who can give a receipt. *Debt,* while it implies the result or. offspring of the *aggregatio mentium,* implies also the faculty of enforcing the duty which that tie imposes. The *dacion en pago,* of necessity, implies a debt. Can any one comprehend the idea of a debt without a creditor to collect—without a debtor to pay; without the capacity of executing a receipt—the faculty of extinguishing the obligation by remitting or releasing it; without the right to sue—to stand in judgment—to bring proofs—to object to evidence—*to enforce payment?* (2 Febrero Mej. 244.)

But there are other considerations, which, we think, go far toward enforcing the rule we rely on.

Under the same general heading, viz : *De la extincion de las obligaciones,* and while considering the nature of the *dacion en pago,* Febrero says, (p. 245, Vol. 2, No. 12) :

" In order that the payment may be held valid there must be, in whose favor the obligation was created, some one, not disabled from administering his own affairs, etc.  .\*    \*    \* Thus, a father should be paid that which is due to his son, and to her husband should be paid that which is due to a married woman."

Now, so far as concerned the conjugal property, Madame Fuller was forbidden by the law to touch one cent. Her husband was the person to manage the partnership business. (1 Escriche, pp. 636–87.)

A creditor is one who has an action, or cause of action, to recover what is due him. He has an action, (*el que tiene accion,*) says the law. And an *accion,* as we have seen, is the process or mode by which what is due the creditor is recovered by proceedings in Courts of justice. But could Concep-

cion Fuller have maintained against her husband an action (*accion*) for the recovery of twelve dollars and a half, paid the Alcalde for this lot ?

An obligation without a creditor ! An indebtedness for which nobody can sue—which cannot be the subject of a suit! A debt, and yet no debtor ! We have an analogy to this in the law concerning conventional partnerships. It is the familiar rule that no action will lie in favor of one partner against his associate for the collection of a specific sum arising out of their partnership dealings. The demand must be for a dissolution, an account, and for such sum as may be ultimately found due. One partner cannot have an attachment against his partner, because he cannot swear to any sum certain. He cannot select, out of the list of debits and credits in the partnership books, a certain item charged against his associate, however justly so charged, and maintain against him an action to recover it.

Even at the death of the wife there is, in the community property, no *estate* which descends to her children. (*Panaud v. Jones*, 1 Cal. 517.)

*E. W. F. Sloan*, *Daniel Rodgers*, and *Sharp & Lloyd*, for Respondents, discussed the validity of a partition of the lot in dispute, made in the Superior Court of the City of San Francisco, in 1852, between the children of Fuller and his wife, Mrs. C. A. Fuller. This question is not discussed in the opinion of the Court, for which reason the argument is not published.

*Sidney L. Johnson*, also for Respondents.

Husband and wife, under the Mexican law prevailing in California, could make any contract with one another without restriction, except donations. In the 4 Partida, Title 11, Law 4, the text treats of *donations* between husband and wife, and says that in general they are forbidden ; although if the donor die first without revoking them they are valid.

So the Supreme Court of the State of Louisiana, in *Labbe's*

*Heirs* v. *Abat*, 2 La. 553, original edition—1 La. 548, 555, Morgan's edition—say: "According to these laws, (the Spanish laws), it is clear that husband and wife were considered so far *separate* persons, that they could validly enter into any onerous contract themselves."

Antonio Gomez, the commentator of the Laws of Foro, in another work of his, entitled *Variæ Resolutiones*, Cap. II, Sec. 3, p. 434, *De Emptione et Venditione*, says: "Item valet iste contractus inter maritum et uxorem. quia licet contractus donationis non valeat inter eos, ut in leg. *Et per totum ff. de donat. inter vir. et uxor.* et in leg. 1. *Et per totum eod. tit.* tamen contractus emptionis et venditionis et quilibet alius contractus onerosus bene valet inter illos, etc * * *. Non obstat quod hodie non valet contractus uxoris sine licentia viri; quia intelligo, quando contrahit cum aliquo tertio; secus, si cum marito ; quia videtur licentiam praestare."

This may be translated as follows: " This contract " (that of purchase and sale) " is valid likewise between husband and wife; because, although the contract of donation is not valid between them," (citing laws of the Roman Digest and Code,) " yet the contract of purchase and sale, and *any other onerous contract whatever*, is clearly valid between them," etc.

So in the Mexican Febrero, (2 Lib. on Contracts or Obligations, Title 44, on useful observations for notaries respecting contracts between certain persons, Sec. 16, Vol. 2, p. 267 :) "No necessita la mujer dicha licencia cuando litiga ó contrata con su marido en las cosas permitidas por derecho, y son las siguientes :

" 1. En todos los contratos onerosos," etc.

Translation : " The wife does not need such authorization when she litigates or *contracts with her husband in the cases allowed by law, and they are the following :*

" 1. *In all onerous contracts,*" etc.

These authorities are doubtless sufficient to establish the truth of the proposition that husband and wife have unlimited capacity, under the Spanish law, to make any contract with one another other than that of donation, unless some conflict-

ing authority be produced. We assert, unhesitatingly, that no such conflicting authority has been or can be shown.

John Fuller and wife did make a valid contract with one another by the act before De Haro. This lot had been granted to John Fuller under the circumstances found by the jury. The fact that the money applied to the payment of the municipal fees was earned by Mrs. Fuller, did not render it her separate property in law. That money was common to them both, and it was at the time equivalent in value to the lot of ground. It was therefore a sufficient, an adequate consideration for the half of the lot, which her husband agreed she should have. Their agreement to divide the lot between them was based on the fact that it had been paid for by his, her, or their labors or earnings. In law it makes no difference whose labor earned the money. It was equally common under any one of these three readings. Mrs. Fuller's agency in getting the means doubtless stimulated her effort to have the equivalent, and may have had some effect in making her husband yield to her desire. Their contract before De Haro further showed that they had agreed to divide the lot by a north and south line, and that they had agreed with one another which part each should have.

The act before De Haro was not an agreement to separate in bed and board, and to dissolve the community as a consequence of such separation; therefore the authorities cited from Schmidt's Civil Law, to the effect that separation from bed and board cannot be voluntary, that it must be decreed by a competent tribunal, are wholly inapplicable. It was an agreement about property; one piece of property standing in the name of the husband, and by law his separate property, but paid for by Mrs. Fuller's earnings, admitted to be in law common earnings, and shown to be, at the date of the contract, the full equivalent in value of the piece of land in question. It was an agreement that, inasmuch as it was so paid for, she should have one half of the lot. It was, therefore, a commutative contract, an onerous contract, in which

one thing was given for another, land for its equivalent in money, or in a debt or equitable claim.

If Mrs. Fuller had claimed of John Fuller's estate one half of the amount paid for the lot as a charge in favor of the community, she would have been estopped by the De Haro instrument, which shows that she got one half of the lot itself in satisfaction of that claim. John Fuller's heirs are equally estopped by it from demanding the land. He had given it in consideration of the equitable claim, and had liberated himself from that claim.

This transaction would be giving a thing in satisfaction of a claim, that which in the Spanish law is called *dacion in solutum* or *dacion en pago*. Escriche defines it to be: " The act by which one thing is given in payment of another which is due. This mode of paying a debt can take place only by the consent of both parties, inasmuch as the creditor is not obliged to accept one thing in lieu of another, as will be seen under the word *paga*. The *dacion in solutum* (giving in payment) is in general a contract that is equivalent to a true sale, the essentials of a sale being found in it—that is, the consent, the thing, and the price. Thus it is that the giving of an inheritance in payment is subject to the Alcabala."

This is the whole article of Escriche on the subject. A similar contract is found in the Louisiana Code, Arts. 2,625–9.

The thing given in this case is half the lot; the consideration, half the amount that had been paid in its acquisition.

This, we say, clearly results from the instrument itself, and the facts found respecting the acquisition of the lot, and the payment of the municipal fees. The validity of a sale depends not on a price being expressed with certainty in the act, but that a price certain should be agreed on by the parties. (*Walker* v. *Fort*, 3 La., 538, Morgan's edit., Vol. 2, p. 344.)

If there were a real consideration, whether it be expressed or not, or if a different one were expressed, the contract would be a valid one. (*Louisiana College* v. *Keller*, 10 La. 164, 167, Morgan's edit. Vol. 5, pp. 478, 480.) Even if the contract were

not strictly a *dacion en pago*, it would still be a good commutative or onerous contract, provided an equivalent were given in anything else than money.   The delivery of the half of the lot followed as a consequence of their contract, inasmuch as they were both living together upon it.   Possession followed the title.   (*Richards* v. *Nolan*, 3 Martin La. N. S. 337, Morgan's edit. Vol. 7, p. 534 ; *Wederstrandt* v. *Marsh*, 11 Robinson La. 533, 538.)

The most elaborate effort of the counsel for the appellants, in opposition to our view of the law, is made in the second point of the brief of Messrs. Shafter & Goold, which is stated in these words : " Fuller could not owe his wife a debt resulting from his use of the ganancial funds."   This point does not deny the capacity of the husband and wife to contract, but denies the consideration in this particular case.   It may freely be admitted that Mrs. Fuller, during the existence of the matrimonial partnership, could not demand the payment, settlement, or delivery of any item, or of her share of any item, of the partnership assets ; that she could not even, without just cause, demand a dissolution of that partnership, and thus bring about indirectly a settlement of accounts and a distribution of the common effects.   Her husband was not a debtor, nor she a creditor, in this sense, of any portion of the common earnings—no more so than any conventional partner of his associate, to adopt the illustration of our learned antagonist.   A debtor who has a term for payment cannot be sued for the debt before the term expires, and, not being in default, may be said in a certain sense not to be a debtor.   Such is the meaning of the French maxim : *Qui a terme ne doit rien*— One who has time owes nothing.   But that which a partner or a creditor cannot demand, or has no legal remedy to enforce, may be done by consent of the other parties.   The delay between parties able to contract may be waived.   If one partner, in settlement of a single item due by him to the partnership, were to give, and his co-partner were to accept, a portion of the former's private estate, the settlement would be valid, and that item would disappear from the partnership

71

accounts, although neither could have compelled the other to such settlement. That item, so settled, might, if left unsettled, be found neutralized at the final liquidation by some counter-claim of the other partner, as supposed by the ingenious counsel. But that possibility, it will hardly be contended, would render this prior settlement invalid.

By the Court, CURREY, J.

Ejectment for the recovery of the western half of one hundred vara lot, No. 24, in the City of San Francisco, excepting a small portion of the same. The lot is described on three sides of it by Sacramento, Kearny and California streets. It was granted to John Fuller by the municipal authorities of the Town of Yerba Buena on the 14th of November, 1837. At that time Fuller was a married man, having a family. On the 4th of February, 1838, he and his wife appeared before the Alcalde of the jurisdiction of San Francisco for the purpose, as they declared, of dividing this one hundred vara lot between them. An instrument in writing was drawn up by the Alcalde, which was signed by the husband and wife in his presence, who, with two assisting witnesses, also signed it. This instrument sets forth that Fuller and his wife were married in the Roman Catholic religion, had a family, and that they appeared before him, the Alcalde, and agreed in his presence and in the presence of the assisting witnesses to have the lot " divided in halves, they having paid the fees arising there-from with their work ;" and then follows the declaration of the Alcalde that " there remains to each of them one hundred varas long from north to south and fifty varas wide from east to west—they mutually agreeing upon their respective portions. And for their safety they sign with me, placing the sign of the cross, not knowing how to sign."

John Fuller died on the 10th of June, 1849, leaving him surviving his wife, Concepcion A. Fuller, and four children, the eldest of whom was then about fifteen and the youngest about eight years of age. One of the plaintiffs in this case is

one of these children, and the other the legal representative of another of them, who claim the right to recover the property as heirs at law of John Fuller, deceased.   The defendants claim the same property by titles derived from the widow, Concepcion A. Fuller, and rely upon the written document which was executed in the presence of the Alcalde, and also upon matters which transpired subsequently to that time, in justification of their alleged title and right to the possession of the property.

The cause was tried before a jury who, under the direction of the Court, rendered a special verdict, upon which the Court gave judgment for the defendants.   By the special verdict the jury found that the money which was paid for the grant was merely municipal fees, and that the same was of moneys earned by Mrs. Fuller while she was the wife of John Fuller, in the capacity of nurse in the family of a stranger.   That after the grant was made, and in the same month, the proper magistrate gave to John Fuller juridical possession of this one hundred vara lot.   That after the 4th of February, 1838, Fuller and his wife lived together on the eastern half of the lot. That during this time they had serious family difficulties, and separated, living apart from each other at various times, and finally separated in 1847, and continued to live apart until Fuller died.   That while Fuller was living on the east half of the lot he stated that the extent of his interest in it was the eastern half thereof; that the lot had been divided between himself and wife, and the eastern half of it had been allotted to him and the western half to her, and that he did not claim any interest in the western half.   That in November, 1847, Fuller caused a line to be run by a surveyor through the centre of the lot from Sacramento to California streets, and caused stakes to be set at the extremities of such line, and also caused a brush fence to be constructed on the line as far as the hill then toward California street.   The jury also found that Fuller and his wife divided the lot between them by the document executed before the Alcalde and also by parol, and that in the division the west half of the premises was allotted to

her and the east half to him ; and that for a long time previous to his death he recognized and acquiesced in Mrs. Fuller's occupation and possession of the premises in controversy with claim of title to it on her part, and on the part of those claiming under her. That since November, 1847, Mrs. Fuller and those claiming under her, including the defendants in this action, had continuous possession of the premises in question, claiming title thereto, and had improved the same. The jury also found as a fact that in 1838 there were no Notaries Public in California, and that the officers who at that date received the declarations of parties stating their contracts, and who authorized and authenticated them as contracts made and passed before them, were Alcaldes or chief magistrates, and also that on or about May 19th, 1847, Edwin Bryant, then the Alcalde of San Francisco, made and issued to John Fuller a document purporting to be a grant embracing the demanded premises—a record of which was introduced in evidence by the plaintiffs as the foundation of their alleged title.

The plaintiffs maintain in argument that by the grants made to John Fuller he became seized in his own right of a sole and separate estate in the lot of land so granted; and further, that the fact that the money which was paid as municipal fees for the grant was earned by Mrs. Fuller or was the common earnings of the spouses, constituted no claim or consideration in her behalf for the divided moiety of the premises which the defendants claim passed to her by the division attempted to be.made of the property between herself and husband. The defendants on their part maintain that by the law in force at the time, a husband and wife could enter into and make contracts with each other respecting property as fully and amply as it was competent for persons holding no such relation to each other to do, except as to donations.

We shall consider the position assumed by the defendants at the outset, because if it be tenable it disposes of all other questions in the case and justifies the judgment rendered.

It is agreed by the counsel for the respective parties that ·

according to the decisions of the Supreme Court in *Scott* v. *Ward*, 13 Cal. 458, and *Noe* v. *Card*, 14 Cal. 576, the lot granted to John Fuller, vested in him as separate property, and hence we shall consider the case upon this hypothesis. The counsel also agree that the money which was advanced for the grant made, was the common or community property of the husband and wife, though the same was the fruit of the wife's individual labor.

In 1 *Febrero Mejicano*, Chapter 10, section 19, it is said : " To the married woman is imparted and transferred by usage and legal .authority, the dominion and possession, revocable and fictitious, of the one half of the property which, during the marriage, she gains and acquires with her husband, but after he dies the same passes to her irrevocably and effectively, so that after his death she becomes the absolute owner in possession and property of the one half which he leaves, in the manner prescribed by law, between conventional partners. For this reason the wife is prohibited not only from giving away her dotal and ganancial property during the marriage, but also from giving alms without the license of her husband except in four cases."

The four excepted instances it is not necessary to mention, as they do not affect any question involved in this case. Again, at section twenty : "A dissolution of the marriage is not necessary to constitute the husband the real and true owner of the property acquired after marriage, for during it he has in effect the irrevocable dominion thereof, and thus he can manage, barter, and even though they be neither military earnings nor *quasi* military earnings, can sell and alienate the same at his pleasure in the absence of an intent to defraud his wife as may be proved by law. Wherefore, while the husband lives, and there is no divorce or dissolution of the marriage, the wife ought not to say that she has any *gananciales*, nor to hinder him in the lawful use of the property acquired, upon the pretext that the law allows her half of it ; because this allowance refers to the cases expressed and no others."

By the Mexican law in force in California prior to its acqui-

sition by the United States, all property acquired by husband and wife during the marriage, and while living together, whether by onerous or lucrative title, and that acquired by either of them by onerous title, belonged to the community; while property acquired by either of them by lucrative title solely, constituted the property of the party making the acquisition. An onerous title, as defined by the Mexican law authorities, was that which was created by the payment or the rendering of a valuable consideration for the property acquired. A lucrative title, by the same law. was that which was created by donation, inheritance or devise. (*Noe* v. *Card,* 14 Cal. 596 ; 2 *Pandectas Hispano-Mejicanos,* 447 ; *Novissima Recopilacion,* Book 10, Title 4.)

The municipal fees which Fuller paid on receiving the grant, whether the same was the fruit of the wife's industry or of his own, or that of both, was community property; and though the lot was obtained by the necessary expenditure of the community fund, still, according to the doctrine of *Noe* v. *Card,* this circumstance in no respect affected the separate character which became impressed upon the property so acquired as the separate property of Fuller. The doctrine laid down in *Noe* v. *Card,* exhibits the title thus derived in its naked legal attitude, without reference to the equity which exists by the rules of an enlightened and just jurisprudence, in which the Spanish-Mexican law had its foundation, controlling the title for the benefit of the person whose means were used in the acquisition of the property.

In Book 1, Title 1, Chapter 4 of Schmidt's Civil Law of Spain and Mexico, it is laid down that "the law recognizes a partnership between the husband and wife.as to the property acquired during marriage, and which exists until expressly renounced in the manner prescribed" in the same chapter. To this community or partnership belongs :

First—All the property, of whatever nature, which the spouses acquire by their own labor and industry.

Second—The fruits and income of the individual property of the husband and wife.

Third—Whatever the husband gains by the exercise of a profession or office.

Fourth—The gains from the money of the spouses, although the capital is the separate property of one of them.

Each of the spouses is entitled to an equal share in the community property, and they are liable equally to the losses and debts incurred during the existence of the conjugal partnership. During the existence of the marriage the husband alone manages or administers the property of the partnership, and he can sell and dispose of it as he deems proper, provided he does so without intent to injure his wife.

In *Labbe's Heirs* v. *Abat et al.* 2 La. 565, the Court, referring to the Spanish laws relating to this subject, say : "According to these laws, it is clear that husband and wife were considered so far separate persons that they could validly enter into any onerous contracts between themselves. A sale is the example given to illustrate this doctrine. They seem to have been prohibited only from making donations to each other, during the marriage, of property actually in possession." By the Spanish-Mexican law, the contract of purchase and sale, and any other onerous contract whatever, entered into between husband and wife, was valid, and she needed no authority or consent of her husband when dealing with him, other than that implied from the transaction itself. (4 Partida, Title 11, Law 4, and the annotations of Gregorio Lopez ; Variae Resoluciones, Chap. II, Sec. 3, by Antonio Gomez ; 2 Febrero Mejicano, Title 44, Sec. 16.)

Conceding that the acquisition of the one hundred vara lot in question was by a gratuitous as contradistinguished from an onerous title, which vested the title to the lot in the husband alone, the effect of the verdict is that the fees or charge exacted by the law for the grant was the joint or common property of the husband and wife. This sum thus withdrawn by the husband from the funds of the community or partnership, and used by him for his individual benefit, constituted a claim in favor of the community against the separate estate of the husband, without the power, however, on the part of the wife,

to enforce its payment while the conjugal relation existed. (Schmidt's Law of Spain and Mexico, *supra ; Noe* v. *Card*, 14 Cal. 606 ; *Barbet* v. *Langlois*, 5 La. Ann. 212 ; *Lawson* v. *Ripley and Wife*, 17 La. 251.)

Fuller, the grantee of the lot, being thus under a pecuniary obligation to the community, the defendants maintain that it was competent for him and his wife, between whom the relation of a property partnership subsisted, to adjust and liquidate his obligation by the arrangement which it is found they consummated by a division of the lot between them. This arrangement the defendants' counsel denominates, in the language of the Spanish law, *dacion in solutum*, or *dacion en pago*, which Escriche defines to be : " The act by which one thing is given in payment of another which is due. This mode of paying a debt can take place only by consent of both parties, inasmuch as the creditor is not obliged to accept one thing in lieu of another, as will be seen under the word *paga*. The *dacion in solutum* (giving in discharge) is in general a contract that is equivalent to a true sale, the essentials of a sale being found in it—that is, the consent, the thing and the price." The plaintiffs' counsel controverts the position thus assumed on the part of the defendants, denying that Fuller could be a debtor to the community, and therefore also denying that there existed any debt to pay or satisfy ; and the negative of the defendants' position is sought to be demonstrated by the argument that if there was an obligation to pay or do something on the part of Fuller, then there must have been some one capable of receiving payment or accepting performance, and of asserting and enforcing the obligation in case its performance was refused. It is also denied that the wife could, under any circumstances, assert as against her husband, that she owned any portion of the acquisitions—the *gananciales* of the conjugal partnership ; and the passage of the law which we have quoted at length from *Febrero* are relied on as establishing the doctrine which the plaintiffs maintain. This law, it may be observed, recognizes the wife's interest to the extent of one half of the *gananciales*, or community property, while it incul-

cates the duty on her part of remaining silent respecting her portion of it during the continuance of the conjugal relation. This monition to the wife, it may be presumed, presupposes the capacity and prudence of the husband, and at the same time is designed to preserve domestic harmony.

Though the husband in the case under consideration might not have owed his wife a debt in the ordinary sense of the term, it does not therefore follow that he was not under an obligation to the community of which she was a member, in whose property she was equally interested with himself. He had used the money belonging to himself and his wife, which was necessary to obtaining a lot of land which by the grant became his separate property. This money was due from him to the community, and though the law afforded no means for enforcing its payment, it was not for that reason any the less due. The contingency, it may be presumed, he knew might occur when it could be enforced as a claim against his separate estate; and we see no reason why he could not satisfy this obligation, if it was agreed to by his wife, by assigning to her the half of the lot which it is found by the jury was worth the half of the community funds used by him to obtain it, and to which she would have been entitled had the marriage become dissolved by his death immediately after he had become invested with the title to the lot. It is said every payment presupposes an existing debt, and as a corollary, it is then said, if something should be given as a payment, and yet had been preceded by no obligation either natural or civil, there will result the right to reclaim it as a thing not due. (2 Febrero Mej. 244.) In the case in judgment there existed an obligation on the part of Fuller to restore to the community that which he had taken from it for his individual advantage, and though, perhaps, while he lived and the relation which he and his wife sustained to each other might continue, he could not have been compelled to perform it, yet he was competent to perform it voluntarily, and thus discharge it in anticipation of the time when his separate estate might

72

be required to reimburse the amount withdrawn by him from the property of the community.

It is argued that if Mrs. Fuller acquired title to half the lot, the acquisition was by onerous title, and therefore what was so acquired became *eo instanti* the common property of the husband and wife, and of consequence the undivided moiety to the portion of the lot so acquired as community property, became vested in him as a member of the matrimonial partnership—that is, that by the transfer of the half of the lot by the husband to his wife, in satisfaction of the wife's interest in a demand which existed as a charge against him in favor of the community, the half so transferred upon that event was transformed into common property. This argument assumes that the charge or claim which the community had against Fuller for the money he had withdrawn from the partnership, was incapable of division and satisfaction so long as the marriage relation might last, though the parties, having the power to enter into contracts with each other, desired to make the arrangement. The result of this doctrine would be that the parties could not, if they would, adjust and settle an obligation existing as a charge against the husband in advance of the contingency which might or might not happen, rendering it absolute and enforcible by legal remedies. But this argument necessarily assumes that the law affecting the property relations of husband and wife, interposed a barrier to her acquiring by onerous cause property in her own right during the marriage. But was this so without limitation? Could she not acquire separate property by purchase, provided she paid the price out of her separate funds? And if she could, was it not competent for her to do so, with the consent of her husband, by the use of her share of the community money allotted to her upon a division of it between the conjugal partners? That she could acquire separate property by purchase with her separate money, there is no reason to doubt (1 Domat, Secs. 889–92), and that the matrimonial partners could divide their common estate between them appears by the case of *Labbes' Heirs* v. *Abat and others.* In that case the plaintiffs

claimed from the defendants an account of the estate of their deceased mother, which they alleged was held in community with her husband, and they prayed judgment for whatever amount might have been the property of the deceased. In the case here referred to the plaintiffs were the heirs of their mother, who by a second marriage, in 1781, became the wife of Jean Pierre Descuirs. Prior to this marriage and in contemplation of it, the parties entered into a marriage contract respecting the property which they respectively had at the time, by which they formed a community of property, and thereupon they were married, and thereafter lived together, holding their property in community, the wife having the right to one half the *acquets* and gains, until 1805, when they agreed to a dissolution of the community or partnership and a separation of property. Accordingly, all the property, both as to the *biens propres* and the *gananciales*, was divided between them, he taking possession of the property assigned to him and she that assigned to her. This separation continued until the wife died, during which time each party had the separate use and enjoyment of the property as assigned. The Court held that this division of the community property was lawful and valid, saying : "The contract by which Descuirs and his wife agreed, in 1805, to a separation of property and dissolution of the matrimonial community which had existed between them, may be considered as partaking strongly of a contract of exchange, by which each one of the parties gave up his common right or claim to all the property in consideration of his having obtained a separate and distinct title as to a part." In respect to the case here cited, the plaintiffs' counsel say : Descuirs and his wife, being the owners of the property, did what they had a right to do when they divided it and each took the half of it. But it is maintained that the case of Fuller and his wife bears no resemblance to the one cited, because Mrs. Fuller owned no part of the lot which the defendants claim was divided between herself and husband. In this connection it is admitted by the counsel for plaintiffs that if Fuller and his wife had acquired this lot by *onerous* contract, they

could have divided it between them. There is no doubt as to the correctness of this admission. In it is recognized the right of the wife to one half the *ganancial* property, and also the power of the parties to contract with each other. Though Mrs. Fuller did not own one half the lot by reason of the grant to her husband, she did own one half the sum which was paid as fees for the grant made. (Azo and Manuel's Institutes of the Civil Law of Spain, Book 1, Tit. 7, Chap. 5.) For her half of this sum of money she held his estate charged, though her remedy to compel its payment may have been in abeyance, depending for the power to exercise it upon the dissolution of the marriage during her life by divorce, or the death of her husband. While Fuller lived and the conjugal relation subsisted it may be he could not have been obliged *in invitum* to restore to the community that which he had withdrawn from it for his private gain; but, nevertheless, we see no reason, nor are we aware of any rule of law, which would incapacitate him from rendering an equivalent to his wife for her interest in the community funds converted by him to his own use. Whether the assignment of half the lot to her in satisfaction of her interest in the community claim against the husband was a *dacion in solutum*, or was of the nature of a contract of exchange, is not a matter of any special importance. If it was either it operated in satisfaction of the demand which existed against him for the money of the community which he had used. This, in our judgment, was a consideration sufficient to support the assignment of the half of the lot by Fuller to his wife. The exchange effected by the contract between the parties was the assignment or transfer by him of the west half of the lot to her in consideration of her interest in the demand which the community held against him, and which interest became in legal effect assigned to him by this contract.

In the case of Descuirs and his wife the property, both as to the *biens propres* and the *gananciales*, was divided between them, yet there was no dissolution of the marriage, and that division of property was said by the Court to partake strongly

of a contract of exchange by which each party obtained a separate and distinct title to a part. In the case of Fuller and his wife, there was not a division of community property, but an assignment of a portion of his separate property for her interest in one of the items of the *ganancial* assets. This transaction, as was said in *Labbes' Heirs* against *Abat and others,* may be considered as partaking strongly of a contract of exchange.

If it were assumed that our understanding of the Mexican law is radically at fault respecting the validity of the assignment of the west half of the lot to Mrs. Fuller for a valuable consideration rendered by her to her husband for it, even then it would not follow that she did not thereby become the owner of the property in controversy. There can be no doubt upon the finding of the jury that Fuller designed to transfer this property to his wife, and to do it effectually; and as to both himself and wife was imputed a knowledge of the law of the land at the time, and consequently also an understanding of the legal effect of the transaction, it cannot be presumed what they did was designed to be abortive or without effect, but rather that he intended she should have the one half of the property while he retained the other; and assuming that the parties knew he could not transfer any portion of the lot to his wife as a *dacion in solutum* or *dacion en pago,* nor by contract of exchange, we are left to discover if they could have intended anything by the execution of the document before the Alcalde and by their subsequent conduct in reference to the subject to which it related; and if we can justly conclude they designed the same to have effect, then the inquiry is suggested, what effect?

In the case of *Labbes' Heirs* it is said that husband and wife " seem to have been prohibited only from making donations to each other during the marriage, of property actually in possession." But we are not to understand from this that a donation by one of the spouses to the other was absolutely void, but rather voidable or revocable. Donations so made are declared voidable or revocable by Law 4, Title 11 of the

4th Partida. This law says, "Such donations are prohibited in order that the parties may not be prejudiced thereby, and dispossess themselves of their property, through their mutual affection; and also because the one who was the most avaricious would be in a better condition than the other who gave freely. And if they do make any such gifts after marriage they will not be valid, if one of the parties become thereby poorer and the other richer, unless he who made the donation did not revoke or annul it during his life, for then it would remain valid. But if the party making the donation revoke it during his life by expressly saying, 'I do not wish such a donation made to my wife, should be valid;' or if he observe silence in this respect, and afterward give or sell the same thing to another person; or if the party receiving the donation die before the party who made it; in either of these cases the first donation will become void."

By this law, and others of like import, a donation made by a wife to her husband or by a husband to his wife, was revocable during the life and at the instance of the donor; and conversely it became valid if not revoked at the death of the donor, if the donee then survived. (*Labbes' Heirs* v. *Abat and others*, 2 La. 567 ; Escriche—*Verbo, Donaciones entre conyuges; Gomez ad leges Tauri*, Laws 50–53, Sec. 65.)

Then upon the theory that Fuller and his wife knew the law to be as subsequently decided in *Noe* v. *Card*, and also that he could not assign and transfer to her half the lot in satisfaction of her interest in the sum of money which was expended to obtain it, the question again recurs what effect did they intend should follow as the result of their conduct? To this inquiry the answer seems to us to be suggested by the very conditions of the circumstances of the case, and therefrom to result naturally and logically, if not inevitably. Fuller had withdrawn from the community treasury twenty-five dollars for his private use, by which act the community was rendered poorer and he richer. His conjugal partner had suffered by the loss which the community had thus sustained and he was disposed to reverse it by a donation to her of half the lot.

Here was a consideration or motive of sufficient potency to prompt him to the just act which he performed. Fuller, in whose power it was to defeat the donation which he intended for the benefit of his wife, was, as the jury in effect found, faithful to the last, and died leaving his wife surviving him his donee of the west half of the lot.

Our conclusion is, that Fuller and his wife intended that the agreement which they entered into before the Alcalde should be operative and effectual, and that if it did not, by reason of some legal impediment, amount to a *dacion in solutum* or *dacion en pago*, nor to a contract of exchange, the same was effectual as a donation by the husband of the west half of the lot to his wife, and that upon his death the donation became irrevocable. (*Holmes* v. *Patterson*, 5 Martin, 693.)

We have thus far assumed that the document purporting to have been executed by Fuller and his wife, in the presence of the Alcalde and witnesses, was genuine, and also that the verdict of the jury was based on evidence which authorized it. But it is now insisted on the part of the plaintiffs that such document was a forgery, and the instrument itself and the other documentary evidence in the case is relied upon as establishing this charge. The record fails to disclose that the point was made on the trial of the cause, and it is not pretended that this objection was suggested until after the case came to this Court. But notwithstanding the omission, if the record itself contains internal evidence that the document is a forgery, it is not too late to raise the objection for the first time in this Court.

The internal evidence on which it is sought to impeach this instrument does not seem to us to create any reasonable suspicion as to its genuineness. The fact that it does not affirmatively appear that Mrs. Fuller had the west half of the lot in her actual possession until 1847 does not establish or tend to establish the fact that this document was forged. The whole lot at the time was worth only twenty-five dollars, and continued without change in this respect until 1846, when it became worth one hundred dollars, and from that it

increased in value in the course of a year to a sum between two hundred and three hundred dollars, and then it was that the division line was surveyed between the east and west halves of the lot, and a brush fence built upon a portion of it. It is not probable that the west half of the lot was esteemed of sufficient value by Mrs. Fuller during the interval between 1838 and 1847 to induce her to fence it, in order to preserve it, as at that period, so far as we are informed, there were no squatters in the country. Nor does the fact that Fuller, in 1847, upon his application to the Alcalde for a new title deed to replace the lost or mislaid original, which he represented was obtained by him in 1842, together with the statements made in his behalf at the time by De Haro and Sanchez, prove that the original grant was not made in 1837. In reference to it Sanchez said it was issued when Don Ignacio Martinez was Alcalde, and himself Secretary. De Haro certified that "the citizen John Fuller is the owner of Lot 24 in the place of Yerba Buena, which consists of two hundred varas in length and fifty varas in width, * * * which lot was petitioned for by the said Fuller, and granted to him by the civil authorities of this jurisdiction in the year 1842." In this certificate De Haro was mistaken as to the form of a hundred vara lot, and it is quite probable that he and Fuller were equally mistaken in respect to the year when the original grant was made, as its date does not seem to have been a matter of any particular importance. Either they were mistaken or Sanchez was. Sanchez said the original title was issued when Don Ignacio Martinez was Alcalde. Martinez held this position in 1836 and 1837, and not in 1842.

The charge of forgery is also sought to be maintained on the ground that Fuller could not write his name in 1847, while his name appears as if written by himself to the instrument executed in February, 1838. This instrument states that Fuller and his wife signed it with the Alcalde, "placing the sign of the cross, not knowing how to sign." There appears to be one sign of the cross upon the record produced in evidence, and that stands opposite the name of Mrs. Fuller.

Which of the parties placed it there is not proved unless by the document itself. It may be that each contributed to it, or, if only one of them made it, the other may have adopted it as his or her sign. A literal interpretation of the words " placing the sign of the cross" would exclude the idea that more than one sign of the cross was intended to be written, and would impute its creation as it appears on the face of the instrument itself to the joint effort of the parties.

The other reasons assigned in argument for the belief that the document in question is a forgery are of less weight even than those here noticed, and therefore they are passed by without further consideration. We think there is no good reason to suspect the genuineness of the instrument.

The conclusion to which we have arrived respecting the effect which the law attached to the agreement entered into between Fuller and his wife, and the assignment by him to her of the western half of the lot, renders it unnecessary to consider the other points contained in the record. We are satisfied that by the Mexican law relating to the questions involved, and also upon the principles of equity, the judgment ought to be affirmed.

Judgment affirmed.


SHAFTER, J., concurring specially:

I concur in the decision for the reason that the document of February 4, 1838, may take effect as a donation on the ground stated in the opinion.